# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITEDHEALTHCARE INSURANCE COMPANY AND UNITED HEALTHCARE SERVICES, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN RENAL ASSOCIATES LLC and AMERICAN RENAL MANAGEMENT LLC,<br><br>Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs UnitedHealthcare Insurance Company and United Healthcare Services, Inc. (collectively, "United") file this Complaint against Defendants American Renal Associates LLC ("ARA LLC") and American Renal Management LLC ("ARM") (collectively "ARA") and hereby state and allege as follows:

## NATURE OF THIS ACTION

1.      For the past several years, United, its customers, and its members have been targeted and injured by an unfair, deceptive, and illegal profiteering scheme orchestrated by ARA.

2.      ARA is a company engaged in just one line of business – the provision of dialysis and related services to patients with end stage renal disease ("ESRD").

3.      Most dialysis patients have or are eligible for Medicare and/or Medicaid insurance. In 1972, Congress, in an effort to alleviate the extraordinary expenses patients faced in connection with dialysis treatments, passed legislation authorizing the End Stage Renal Disease Program under Medicare, which today extends Medicare coverage to 90% of Americans who require dialysis services from companies like ARA. Regardless of whether they qualify for Medicare, many patients with ESRD qualify to receive health insurance through Medicaid, a

social healthcare program for families and individuals with low income and limited resources that was created by amendments to Title XIX to the Social Security Act, 42 U.S.C. § 1396 *et seq.*

4.     The availability of Medicare and/or Medicaid for all ESRD patients is a serious problem for ARA because ARA depends on commercially-insured patients for its profits. In fact, ARA has acknowledged in its filings with the SEC that "[w]e depend on commercial payors for reimbursement at rates that allow us to operate at a profit," that "our revenues are sensitive to the number of patients with commercial insurance coverage," that "[i]f the rates paid by commercial payors decline, our operating results and cash flows would be adversely affected," and that it needs to "continuously obtain new patients covered by commercial insurance" to avoid adverse operating results, all while identifying one of the main risks to "[a]n investment in shares of our common stock" to be the "decline in the number of patients with commercial insurance or decline in commercial payor reimbursement rates[.]" In other words, in order for ARA to operate profitably, it needs to keep people off of Medicare and Medicaid so it can service as many commercially-insured patients as possible.

5.     The percentage of treatments ARA is rendering at any given time to patients with commercial insurance is referred to as ARA's "commercial mix." Given ARA's dependence on commercial patients for profit, ARA's commercial mix is a key indicator of the strength of ARA's business at any given point.

6.     Increasing its profits and commercial mix was paramount to ARA as it prepared for the initial public offering ("IPO") it completed in April 2016—an IPO ARA had been contemplating since at least March 2013.

7.     In connection with its effort to increase profits and commercial mix, ARA orchestrated a multi-faceted scheme that targeted individuals (called "members") insured under United's commercial Employer Group Health Plans ("EGHPs") and COBRA plans as profit centers that could be used to grow ARA's commercial mix, illegally increase revenues and profits, and inflate the company's IPO price.

8.    <u>First</u>, ARA had to figure out how to get United's commercial members with ESRD into ARA clinics. This was not simple. ARA is not in United's robust national network of dialysis providers and, in the managed care model of modern healthcare, people with commercial insurance generally utilize only in-network doctors, hospitals, pharmacies, and other medical providers—including dialysis clinics—in order to avoid the high personal costs associated with out-of-network providers like ARA. And because most dialysis providers are in United's network, making thousands of in-network dialysis clinics available to United's commercially-insured members at significantly lower personal costs, there is virtually no legitimate reason that United's commercially-insured members would knowingly elect to visit an out-of-network ARA dialysis clinic.

9.    In order to change and disrupt this dynamic, ARA illegally interfered with United's network contracts with nephrologists (doctors who treat patients suffering from Chronic Kidney Disease ("CKD"), including ESRD)—contracts that require the nephrologists to refer United members only to other network providers or require the nephrologists to use reasonable commercial efforts to direct United members only to other network providers. ARA did this by offering financial incentives to nephrologists who were in a position to refer United members to ARA's out-of-network facilities for dialysis, in an effort to undermine United's contracted networks and divert United members away from receiving dialysis at network providers.

10.    Upon information and belief, ARA engaged in due diligence that helped it identify nephrologists who had the highest commercially-insured patient populations. ARA then offered those nephrologists ownership interests as high as 49% in ARA dialysis clinics that were already operating or would be opened in the nephrologists' geographic area. Upon information and belief, Joe Carlucci (ARA's CEO), Syed Kamal (ARA's President), Michael Costa (ARA's General Counsel), John McDonough (ARA's former COO), and/or Jon Wilcox (ARA's CFO) frequently helped form and operate these clinics, oftentimes serving as officers, members, and/or managers of the entities. The ownership relationship was structured so that the net profits of the jointly-owned dialysis clinics were distributed in proportion to the nephrologists' and ARA's

ownership interests. This means that, for as long as a nephrologist held an ownership stake in an ARA dialysis clinic, the nephrologist would continue to get up to 49% of the profits generated by the clinic. But because, as noted above, ARA's dialysis clinics are only profitable if they provide services to a sufficient number of commercially-insured patients, ARA's business model incentivized and induced United's in-network nephrologists to refer United's commercially-insured members (who could have received dialysis at in-network dialysis clinics) to the out-of-network ARA clinics where the nephrologists had undisclosed ownership interests. Under ARA's business model, the more commercially-insured patients the nephrologists referred to the ARA clinics, the greater the profit that would be generated by the services rendered at those clinics, and the more money that would accrue to the referring nephrologists.

11.     Additionally, in order to ensure that nephrologists referred their commercially-insured patients (including United members) to its new clinics, ARA offered many nephrologists "IPO Put Rights," which basically allowed nephrologists to sell their ownership stake in an ARA dialysis clinic for an exorbitant profit if ARA completed a successful IPO. Because the IPO Put Right calculation factored in the "ARA Public Value Based Upon IPO Price Opening," "ARA Clinic Value," and "ARA Clinic Value EBITDA," the nephrologists were incentivized and induced to make the clinics as profitable as possible (i.e., to refer as many commercially-insured patients to the clinics as possible). ARA has since informed nephrologists that the IPO Put Rights ARA offered them violated the Federal Anti-Kickback Statute.

12.     The ownership incentives ARA offered nephrologists induced the nephrologists to refer United members away from in-network dialysis providers in favor of out-of-network ARA dialysis clinics—exposing the members to increased cost-sharing obligations and out-of-pocket costs, and allowing ARA to bill United at exorbitant rates for dialysis services rendered. Neither ARA nor the nephrologists ever informed United that the in-network nephrologists had lucrative ownership stakes in the out-of-network ARA clinics.

13.     Second, ARA had to figure out how to keep United's commercially-insured members from objecting when their nephrologists referred them to out-of-network ARA dialysis

clinics and to keep treating at ARA's out-of-network facilities. For obvious reasons, United's

members would not want or agree to pay the increased out-of-pocket expenses associated with

ARA's out-of-network clinics when they could avoid those costs altogether by going to one of

United's in-network dialysis clinics. Faced with this unavoidable reality, ARA agreed, promised,

and decided to routinely, systematically, and illegally waive the members' cost-share obligations

(so long as the members agreed to continue receiving out-of-network services from ARA). Upon

information and belief, in order to hide its scheme from United and to avoid running afoul of

various state statutes that prohibit waiver of patient cost-sharing amounts, ARA also, on

occasion, paid the members' coinsurance and deductible obligations. Indeed, ARA's former Vice

President of Reimbursement, Jennifer Cordeiro, testified as follows:

> Q.    Did you as vice president of reimbursement of ARA also tell the American
>       Kidney Fund to use ARA money to pay for ARA patients' United
>       insurance plan copays?
>
> A.    I invoke the Fifth Amendment.
>
> Q.    Is it true that when you were the vice president of reimbursement at ARA,
>       you told the American Kidney Fund to use ARA money to pay for ARA's
>       patients' United insurance plan coinsurance?
>
> A.    I invoke the Fifth Amendment.
>
> Q.    Is it true that when you were vice president of reimbursement at ARA, you
>       told American Kidney Fund to use the money that ARA had paid it to pay
>       for ARA patients' United insurance plan deductibles?
>
> A.    I invoke the Fifth Amendment.

14.    Finally, ARA had to figure out how to induce United's commercially-insured

members to stay enrolled in United commercial policies that served ARA's financial interests,

and to prevent them from enrolling in the Medicare and/or Medicaid plans to which they were

entitled. To do so, ARA paid United's members' commercial insurance premiums. ARA

disguised these payments by routing them to United's members through a purported charity

called the American Kidney Fund ("AKF"). ARA used this payment method so that United

could not tell that ARA was directly or indirectly paying the premiums of patients enrolled in

United's commercial insurance plans, and to induce those patients to obtain out-of-network

dialysis services from ARA on terms that served ARA's financial interests and allowed ARA to charge exorbitant sums to United. The payments to and through AKF were part of an understanding between AKF and ARA wherein ARA had to make massive contributions to AKF if ARA wanted AKF to disburse and route that money back to ARA's patients in a way that would advance ARA's profit-maximizing goals. In essence, ARA routinely and systematically paid AKF huge "donations" so that AKF would disburse substantial sums of ARA's money back out in the form of "charitable" grants to pay ARA patients' premiums for commercial insurance that the patients did not need or want.

15.     For several reasons, including the obvious tax benefits and its desire to avoid violating various anti-kickback laws, ARA publicly characterized its pay-to-play payments as "charitable contributions" despite the fact that they were not made for charitable reasons and instead were designed to maximize ARA's profits and serve ARA's private financial interests.

16.     In fact, when asked about ARA's business model and its scheme to use inducements to extract maximum sums from United's EGHPs, Jennifer Cordeiro again sought to protect herself from criminal charges by invoking the Fifth Amendment, testifying as follows:

> Q.     Isn't it true that when you were vice president of reimbursement at ARA, either [you] yourself or the employees that you instruct[ed] steered many ARA patients to United employer group health plan[s]?
>
> ***
>
> A.     I invoke the Fifth Amendment.
>
> Q.     And it is true that when you were the vice president of reimbursement at ARA, you instructed those employees who worked for you to steer ARA patients to United insurance plan[s] including, but not limited to, ACA plans and employer group health plans?
>
> ***
>
> A.     I invoke the Fifth Amendment.
>
> Q.     Is it true that when you were the vice president of ARA -- I'm sorry -- vice president of reimbursement at ARA, that you worked with the American Kidney Fund to use money that ARA had paid to the American Kidney Fund to pay for ARA's patients' United insurance plan premiums?
>
> A.     I invoke the Fifth Amendment.

> Q.  As vice president of reimbursement at ARA, you took action to keep patients on United insurance plans, including employer group health plans, COBRA plans, and ACA plans, even when the patients expressly requested Medicare or Medicaid plans instead, is that right?
>
> ***
>
> A.  I invoke the Fifth Amendment.
>
> Q.  You knew as the vice president of reimbursement at ARA that ARA has a financial incentive to have its patients on private insurance plans rather than Medicare or Medicaid, correct?
>
> A.  I invoke the Fifth Amendment.

17.     ARA's illegal scheme resulted in hundreds of United's EGHP and COBRA plan members being referred by United's in-network nephrologists to out-of-network ARA dialysis clinics without the patients ever being told of the financial consequences associated with ARA's out-of-network status. It also resulted in these plan members being induced to stay on United's plans and continue receiving dialysis services from ARA on terms that served ARA's financial interests, rather than switching to more affordable Medicare and/or Medicaid plans.

18.     ARA billed United, its customers and its members hundreds of millions of dollars based on these improper referrals and inducements. In doing so, ARA inflated and misstated its charges, and misrepresented and concealed the cost-share waivers and inducements it was using to generate dialysis claims for United members and keep them treating at its facilities. Because of ARA's deceptive and fraudulent conduct, United paid ARA tens, and possibly hundreds, of millions more than it would have paid had ARA acted lawfully. ARA took advantage of United, its customers, and its members so that it could maximize its profits and improperly inflate its value in advance of the IPO. When asked about the commercial metrics that affected ARA's IPO, Jennifer Cordeiro again invoked the Fifth Amendment, testifying as follows:

> Q.  Were the commercial mix metrics important as ARA prepared for its IPO, its initial public offering, in April of 2016?
>
> A.  I invoke the Fifth Amendment.
>
> Q.  Did anyone at ARA tell you while you were the VP of reimbursement there that ARA needed to improve its commercial mix numbers before the IPO?
>
> A.  I invoke the Fifth Amendment.

Q.      Did you understand as vice president of reimbursement of ARA that
ARA's initial public offering would be more successful if its commercial
mix metric was higher?

A.      I invoke the Fifth Amendment.

19.     Of course, as described herein, ARA plotted to make its initial public offering
more successful than it otherwise would have been by illegally incentivizing United's in-network
nephrologists to refer United's commercially-insured members to ARA's clinics against the
members' best interests—all in the name of wrongfully inflating ARA's commercial mix
numbers.

20.     United brings this action to protect its members from further illegal and injurious
conduct by ARA, to stop ARA from continuing to engage in the conduct and from further
interfering with United's network contracts with nephrologists, and to recover the significant
sums of money that were wrongfully paid to ARA based on the actions described in this
Complaint.[1]

## PARTIES

21.     Plaintiff UnitedHealthcare Insurance Company is a corporation organized under
the laws of the State of Connecticut, with its principal place of business in the State of
Connecticut. UnitedHealthcare Insurance Company fully-insures and administers health plans.
UnitedHealthcare Insurance Company is an insurance company authorized to provide health care
insurance in Massachusetts.

---

[1] ARA previously implemented another scheme directed at certain Affordable Care Act plans
offered by United in a small number of states. Claims arising out of that scheme are at issue in
*UnitedHealthcare of Florida, Inc., et al. v. American Renal Associates LLC, et al.*, Case
No: 9:16-cv-81180-KAM, venued in the Southern District of Florida. In contrast to that scheme,
claims at issue here apply to ARA's efforts to target non-Affordable Care Act plans, specifically
United's Employer Group Health plans and COBRA plans, and ARA's efforts to disrupt
United's contracted network by using inducements to divert patients out of United's network and
then fraudulently billing United with false and inflated charges on non-Affordable Care Act
plans.

22.     Although the full scope of ARA's scheme is known only to ARA, on information and belief, many health plans provided, insured, and administered by UnitedHealthcare Insurance Company have been targeted by ARA's deceptive and unfair scheme. ARA has caused UnitedHealthcare Insurance Company to make payments on thousands of claims.

23.     Plaintiff United Healthcare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. United Healthcare Services, Inc. administers plans that are funded by plan sponsors. United Healthcare Services, Inc. provides third-party administrative health plan services in Massachusetts.

24.     Although the full scope of ARA's scheme is known only to ARA, on information and belief, many plans administered by United Healthcare Services, Inc. have been targeted by ARA's deceptive and unfair scheme. ARA has caused United Healthcare Services, Inc. to make or authorize payments on thousands of claims. Plans damaged by ARA's conduct have assigned the recovery of their funds to United Healthcare Services, Inc.

25.     Defendant ARA LLC is a company organized under the laws of the State of Delaware, with its principal place of business located at 500 Cummings Center, Suite 6550, in Beverly, Massachusetts. ARA LLC owns and operates free-standing dialysis clinics throughout the country.

26.     Defendant ARM is a company organized under the laws of the State of Delaware, with its principal place of business located at 500 Cummings Center, Suite 6550, in Beverly, Massachusetts. ARM is 100% owned by ARA LLC. ARM employs the individuals who work within the "ARA" enterprise, including all of ARA's executives, and also manages the free-standing dialysis clinics owned by ARA LLC.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000. Moreover, absent injunctive relief, United will suffer substantially

in excess of $75,000 as a result of Defendants' actions described herein. This Court additionally has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, United asserts claims in this case that arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* United has standing to bring ERISA actions because it serves as an ERISA fiduciary pursuant to ERISA plans for which it acts as a claims administrator with discretion in administering claims. This Court has jurisdiction over United's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

28.     This Court has personal jurisdiction over Defendants in this action because Defendants' principal place of business is in Massachusetts, Defendants systematically and continuously conduct business in Massachusetts, and the activities giving rise to this action have taken place in and/or were directed from Massachusetts.

29.     Venue is proper in this district because a substantial part of the events giving rise to the claims in this action have occurred in this district. Specifically, Defendants have offered kickbacks to nephrologists, instructed and incentivized nephrologists to refer patients to Defendants' clinics, made payments to AKF, and made payments for patients' premiums and cost-sharing obligations, decided to waive patient cost-sharing obligations, submitted claims to United, and processed payments from United within this district.

## FACTUAL BACKGROUND

### Chronic Kidney Disease, Nephrologists, and Dialysis

30.     The kidneys play a critical role in the body's effort to excrete waste produced by metabolism. Kidneys filter blood and remove water-soluble wastes, such as urea and ammonium. Every day, the kidneys filter about two hundred quarts of blood to produce about one to two quarts of urine, which is composed of wastes and extra fluid. The kidneys are important because they keep the composition of the blood stable, which lets the body function properly.

31.     Nephrologists are doctors who diagnose, manage, and treat kidney diseases. One of these diseases is CKD, which is a condition characterized by a gradual loss of kidney function over time. There are five stages of chronic kidney disease, which generally track the functionality of the kidneys. When kidney function drops to 10 to 15 percent of normal capacity, a patient is said to have stage five chronic kidney disease, which is an irreversible disorder also called ESRD.

32.     Patients with ESRD are commonly treated with dialysis, which is a process for removing waste and excess water from the blood. If a patient needs dialysis, a nephrologist will generally refer the patient to a dialysis provider. ESRD patients typically receive dialysis treatments three times per week for the rest of their lives. Dialysis does not correct or improve the compromised functions of the kidneys—it simply replaces some of the kidneys' functions through diffusion (waste removal) and ultrafiltration (fluid removal).

33.     For patients suffering from ESRD, the only cure is a kidney transplant.

**Insurance Coverage for People with ESRD**

34.     Medicare pays ARA less than $300 per dialysis treatment rendered to a patient. And yet, most dialysis patients have or are eligible for Medicare. Indeed, today, Medicare coverage extends to 90% of Americans with ESRD who require dialysis from companies like ARA. Under the law, people with ESRD qualify for Medicare, regardless of age, so long as they (or their spouses) have sufficient working credits. Medicare generally costs no more than $134 a month, but it can be much less if patients qualify for low income assistance, and it is free if patients qualify for Supplemental Security Income.

35.     Patients who become eligible for Medicare, including by virtue of developing ESRD, need to enroll in Medicare in a timely fashion or they risk possibly incurring financial penalties for late enrollment. Moreover, if patients do not have Medicare when they receive a kidney transplant, Medicare Part B will not cover the cost of the necessary immunosuppressant medications patients require following a transplant.

36.     Like Medicare, Medicaid pays ARA less than $300 per dialysis treatment rendered to a patient. But many patients with ESRD qualify to receive health insurance through Medicaid. Medicaid is a government insurance program available for individuals and families with low or limited resources. Within the last several years, 31 states and Washington D.C. have expanded Medicaid to be available for individuals who make more than the national poverty rate. Medicaid pays for dialysis and kidney transplants. And although patient responsibility varies by state, ESRD patients who have Medicaid are 100% covered for dialysis and have very low out-of-pocket expenses for other medical care and prescriptions. Medicaid also pays for other essential non-medical services such as medical transportation and home assistance.

37.     Patients are often working and/or enrolled in employer group health plans ("EGHPs") before they develop ESRD. EGHPs are commercial benefit plans (either administrative services only plans or fully-insured plans) that are sponsored by private employers. Patients with ESRD who are working can stay on EGHPs, so long as they maintain their employment and pay their premiums.

38.     Oftentimes, patients with ESRD can no longer work. In these instances, they likely qualify for Medicare and/or Medicaid, as discussed above. Patients with ESRD who cannot continue to work can also sometimes keep their EGHPs under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA")—a law that requires employers with more than 20 employees to allow individuals to keep their EGHP coverage for a temporary amount of time if they leave their job under certain conditions. To maintain EGHP coverage under COBRA, individuals with ESRD may be required to pay the entire premium of the EGHP, and coverage can last up to 36 months, depending on the individuals' situation.

39.     ARA charges United thousands of dollars per dialysis treatment rendered to a patient enrolled in a United EGHP or COBRA plan, notwithstanding the fact that the treatment provided to EGHP and COBRA members is *the exact same* as the treatment provided to Medicare and Medicaid members.

**United's Fully-Insured and Administrative Services Only EGHPs**

40.     United is a health services company that provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of benefit plans and policies of insurance, including group and individual health benefit plans, employer-sponsored benefit plans, and government-sponsored benefit plans.

41.     United aims to provide the individuals covered by the benefit plans it insures and administers with comprehensive healthcare coverage at affordable costs, from well-qualified medical professionals, at professionally staffed and accredited medical facilities.

42.     In its capacity as an insurer and as a claims administrator, United processes millions of health care claims per day, and is responsible for administering hundreds of millions of health care claims every year.

43.     As discussed, United is an insurer and claims administrator for EGHPs that are sponsored by employers. The health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 1001 *et seq.*, while those sponsored by governmental employers and certain religious organizations are exempted from ERISA. United provides insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans (called "United members").

44.     United offers and administers a variety of different plans, but the types of plans that have been targeted by ARA's misconduct are (a) fully-insured plans, and (b) administrative services only ("ASO") plans.

45.     United funds and serves as the administrator of its fully-insured plans. United also adjudicates claims for fully-insured plans and makes benefit payments from its own assets.

46.     United's ASO plans are funded by their respective sponsor, generally an employer, and the employer-sponsor's employees' contributions.

47.    United provides extensive administrative services for its ASO plans pursuant to Administrative Services Agreements ("ASAs") United has with the ASO-plan sponsors, which identify the rights and obligations of each party.

48.    The ASAs assign to United the authority, responsibility, and discretion to determine eligibility for coverage, make factual determinations, make coverage determinations, conduct a full and fair review of each denied claim, evaluate claims for health insurance benefits to ensure that they are proper and payable under the terms of the relevant plans, process and make payment on claims for reimbursement submitted by healthcare providers, and adjudicate plan members' appeals relating to adverse benefits decisions.

49.    The ASAs also give United the exclusive authority and responsibility to monitor and pursue overpayments and fraud that involve the plans' funds, including taking legal action on behalf of the ASO plans to recover such funds. The relevant ASAs state that the customers delegate to United the authority to recover funds that have been overpaid or procured through fraud and abuse, as well as the authority to initiate litigation and undertake legal actions to recover payments which have the largest impact for the largest number of customers. The ASAs typically require United to return to the customers/plans funds that it recovers, subject to United's right to retain a portion of the recovered funds as compensation for its services and as further set forth in the ASAs. The ASO plan sponsors agree that they will not engage any other entity to provide these recovery services, unless United consents.

50.    With respect to the ASO plans harmed by ARA's conduct, United operated as the claims-review fiduciary of those plans, and has standing to bring an action regarding claims submitted to United by ARA in the past or in the future. United has a concrete and particularized interest in paying only valid claims under plans it insures and administers to ensure its members' financial interests are protected. ARA's unlawful conduct has also caused United to suffer a concrete injury in having to expend significant amounts of money, time, and resources investigating and trying to contain ARA's alleged unlawful practices and the resulting harm they have caused.

14

51.     United's fully-insured and ASO plans function in accordance with plan documents, which establish, among other things, the rights and responsibilities of both the plan and the members of the plan.

52.     The terms of the plans set forth conditions that govern whether expenses for medical services incurred by United members are covered and reimbursable by the plans. The plans also establish United's members' responsibilities to pay for some portion of or all of the charges submitted by medical providers for the services the members receive. These member payment responsibilities (also called cost-sharing obligations) generally consist of a combination of a deductible (the amount of money a member must pay for services before his or her insurance benefits are triggered), coinsurance (the percentage of a provider's charges the member must pay for services received after his or her deductible has been met), and copays (a flat amount per visit).

53.     United's fully-insured plans obligate United members to pay their required cost-sharing amounts for services rendered to them in order for those services to be covered and eligible for benefits paid by United, and reserve the right to recover payments made to providers where member payment responsibilities were not paid or not required to be paid.

54.     For example, United's Choice Plus plan, a fully-insured plan offered to certain members targeted by ARA's conduct, provides that United members:

> [A]re responsible for paying, directly to [their] provider, any amount identified as a member responsibility, including Copayments, Coinsurance, any deductible and any amount that exceeds Eligible Expenses.

The plan provides that:

> In the event a non-Network provider waives Copayments, Coinsurance and/or any deductible for a particular health service, no Benefits are provided for the health service for which the Copayments, Coinsurance and/or deductible are waived.

The plan further provides that it does not pay benefits for:

> Health services for which [the member has] no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under the Policy.

55.     United's Choice Plus fully-insured plan also contains provisions allowing United to recover any overpayments made to providers or facilities. For example, in a section entitled "Refund of Overpayments," the plan states that:

> If we pay Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to us if any of the following apply:
>
> - All or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person.
> - All or some of the payment we made exceeded the Benefits under the Policy.
> - All or some of the payment was made in error.
>
> The refund equals the amount we paid in excess of the amount we should have paid under the Policy.

56.     This provision creates an equitable lien by agreement over any overpayments made by United, and puts plan members and providers on notice that any overpayment made by United will be recoverable (i.e., subject to a lien) as soon as the overpayment is made.

57.     United's other fully-insured plans targeted by ARA's conduct contain substantially similar or identical provisions.

58.     United's ASO plans similarly obligate United members to pay their required cost-sharing amounts for services rendered to them in order for those services to be covered and eligible for benefits paid by United, and reserve the right to recover payments made where member payment responsibilities were not paid or not required to be paid.

59.     For example, United's Health Savings plan, an ASO plan offered to certain members targeted by ARA's conduct, provides that United members:

> [A]re responsible for paying, directly to [their] provider, any amount identified as a member responsibility, including Coinsurance, any deductible and any amount that exceeds Eligible Expenses.

The plan provides that it does not pay benefits for:

> [E]xpenses for health services and supplies: … for which a non-Network provider waives the Deductible or Coinsurance amounts … [or] … for which [the member has] no legal responsibility to pay, or for which a charge would not ordinarily be made in the absence of coverage under this Benefit Plan[.]

60.     United's Health Savings ASO plan also contains provisions allowing United to recover any overpayment made by United to providers or facilities. For example, in a section entitled "Refund of Overpayments," the plan states that:

> If the [plan] pays Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to the plan if any of the following apply:
>
> - all or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person.
>
> - all or some of the payment the plan made exceeded the Benefits under the Policy.
>
> - all or some of the payment was made in error.
>
> The refund equals the amount the [plan] paid in excess of the amount that should have paid under the plan.

The plan further states that:

> If UnitedHealthcare makes a benefit payment over the amount that [the member is] entitled to under this plan, UnitedHealthcare has the right to:
>
> - Require that the overpayment be returned on request; or
> - Reduce any future benefit payment by the amount of the overpayment.

61.     The plan further states that:

> By accepting benefits (whether the payment of such benefits is made to you or made on your behalf to any provider) you agree to the following rules:
>
> - ***Constructive trust****:* If you receive any payment as a result of an injury, illness or condition, you will serve as a constructive trustee over those funds. Failure to hold such funds in trust will be deemed a breach of your fiduciary duty to the plan….
>
> - ***Lien rights:*** The plan will automatically have a lien to the extent of benefits paid by the plan for the treatment of the illness, injury or condition upon any recovery whether by settlement, judgment or otherwise related to treatment for any illness, injury or condition for which the plan paid benefits. The lien may be enforced against any party who possesses funds or proceeds representing the amount of benefits paid by the plan, including (but not limited to) you, your representative or agent, and/or any other source that possessed or will possess funds representing the amount of benefits paid by the plan.

62.     Thus, the plan provisions create an equitable lien by agreement over any overpayments made by United, and puts plan members and providers holding assignments of

benefits from members on notice that any overpayment made by United will be recoverable (i.e., subject to a lien) as soon as the overpayment is made.

63.     United's other ASO plans targeted by ARA's conduct contain substantially similar, or in some cases identical, provisions.

64.     Members' payment responsibilities for services are an important check on fraud, waste, and abuse. Since it is members, not their plans, who control the services they receive, members' payment responsibilities sensitize members to unnecessary or overpriced services, resulting in more affordable healthcare for all members (as well as healthcare consumers, generally). This is particularly true with respect to out-of-network providers, discussed below, as patient cost-sharing obligations sensitize members to the true cost of out-of-network services, ensuring that if a member receives these services, he or she is willing to pay a greater portion of the expenses associated with those services out of his or her own pocket.

### Network and Out-of-Network Providers

65.     Members can obtain healthcare services from either network providers (otherwise known as participating care providers) or non-network providers (otherwise known as non-participating care providers).

66.     Network providers are providers with whom United has entered into network agreements. In exchange for agreeing to provide services to United's members, to accept reimbursement at fixed, specified rates for those services, and to not bill United's members for any other amounts (except under limited circumstances), network providers receive certain benefits, including access to members of United's plans as a source of patients.

67.     United's network arrangements not only benefit network providers, they also benefit employers and United plan members by controlling overall healthcare costs and increasing the quality of medical care. Moreover, pursuant to the terms of the health plans they are enrolled in, members' payment responsibility amounts are also generally lower for services they receive from network providers than for services from non-network providers, and members are protected from being billed by network providers for the difference between their United

18

plan's reimbursement to the network provider and the provider's billed charge. This structure allows United's members to obtain medical services from in-network providers with minimal financial risk or out-of-pocket expenses.

68.     Out-of-network (or "non-network") providers have not entered into any provider agreement with United. United has not agreed to pay non-network providers any predetermined amounts for services provided to United's members, and non-network providers have not agreed to refrain from charging United members for the balance of whatever portion of the provider's charges United does not pay. Non-network providers charge and bill United and plan members at rates set by the providers, which are almost always higher than the contractual rates agreed to between United and network providers. United members are also subject to being billed by their out-of-network providers for the difference between the provider's charges and the amount of reimbursement paid by United. This is in addition to the amounts the members must pay for coinsurance and deductibles.

69.     ARA is a non-network provider with respect to United.

**United's Contracts with Referring Nephrologists**

70.     Many nephrologists, including the nephrologists at issue in this case who have referred United members away from network dialysis providers in favor of out-of-network ARA facilities in which the nephrologists hold an ownership interest, are themselves network providers with United.

71.     These nephrologists have entered into contracts with United (UnitedHealthcare Insurance Company and its affiliates, including United Healthcare Services, Inc.), which are called either Physician Contracts, Medical Group Contracts, or Medical Group Participation Agreements.

72.     Absent specific circumstances not present here, the Physician Contracts and Medical Group Contracts require the nephrologists to refer customers only to other network physicians and providers, while the Medical Group Participation Agreements require the nephrologists to "use reasonable commercial efforts to direct [United members] only to other

providers [including dialysis facilities] that participate in United's network…[.]" United's Administrative Services Guide, which is incorporated into each of these contracts, reinforces these requirements and obligates the nephrologists to (a) have detailed discussions each time they refer a patient to a non-network dialysis facility, and (b) complete a Member Advance Notice Form memorializing the discussion, as well as the patient's consent to the higher-cost obligations associated with non-network providers. These Member Advance Notice Forms are specifically designed to ensure that United's network physicians provide United's members with all information they need to make an informed decision about seeking services from expensive out-of-network providers that have not gone through United's credentialing process.

73.     Given their contractual obligations to United, nephrologists who are network providers should almost never be referring their patients to ARA for dialysis services—especially since United has a robust network of contracted dialysis providers around the country in almost all locations where ARA operates facilities. And on the rare instance where they might find it necessary to refer a United member to an out-of-network dialysis facility, they should always complete the Member Advance Notice Form protocol with the United member.

### ARA's Operations and Joint Venture Business Model

74.     ARA is a vertically-integrated company engaged in just one line of business – the provision of dialysis services.

75.     ARA operates exclusively through what it calls a "physician joint venture model" in which ARA "partners" with nephrologists to develop, own, and operate dialysis clinics.

76.     Each "ARA" dialysis clinic is its own limited liability company. However, upon information and belief, Joe Carlucci (ARA's CEO), Syed Kamal (ARA's President), Michael Costa (ARA's General Counsel), John McDonough (ARA's former COO), and/or Jon Wilcox (ARA's CFO) helped form many of the clinics and frequently served as officers, members, and/or managers of the entities.

77.     ARA LLC operates and owns a controlling interest in each of its dialysis clinics, and allows nephrologists to obtain and own a non-controlling interest in each of the clinics. The

structure and terms of these joint ventures are set forth in joint-venture operating agreements that ARA LLC enters into with nephrologists for each of its clinics.

78.     ARM is a wholly-owned subsidiary of ARA LLC and manages many of the business operations of each of ARA LLC's dialysis clinics. The functions ARM performs for the clinics are set forth in management services agreements that ARM enters into with the clinics. Through these agreements, ARM provides the clinics with all of the managerial, accounting, financial, technological, and administrative support necessary for the clinic to operate. The management services ARM provides for the clinics include: negotiating terms for pharmaceuticals and medical supplies; human resources functions; general accounting functions; clinical and technical services; supervising site searches and negotiating leases; obtaining and maintaining licenses, permits, and certifications; providing manuals, policies, and procedures; performing payroll processing, and personnel and benefit administration; billing and collection and payment of accounts receivable; providing staff training programs; recommending and purchasing of equipment; preparing and filing cost reports; preparing annual operating budgets; administering financial and clinical information systems; procuring and maintaining insurance policies; and performing legal and compliance services.

79.     ARA LLC and ARM occupy the same space within the "ARA" corporate headquarters building in Beverly, Massachusetts, and are managed by the same set of executives who operate and manage the "ARA" business—including the joint venture dialysis clinics— from that corporate headquarters.

80.     ARA makes money in the following way. A nephrologist refers a patient who needs dialysis to an "ARA" clinic owned by ARA LLC and managed by ARM. That patient then starts receiving dialysis from that clinic approximately three times a week. After dialysis services are rendered, ARM bills commercial insurers, charging them 20 times or more the reimbursement amounts established by Centers for Medicare and Medicaid ("CMS") for the same services. Insurers then make payments to ARA, which are distributed between ARA LLC,

ARM, and any nephrologist with an ownership share in the clinic, as follows: ARA LLC gets an amount commensurate with its ownership share in the clinic where services were rendered, any nephrologist with an ownership share gets an amount commensurate with his/her ownership share, and ARM gets an amount as specified in its management services agreement. Thus, the more money received for services rendered at the ARA clinics, the more money ARA LLC, ARM, and ARA's co-owner nephrologists make.

81.     ARA makes substantially less money off dialysis patients with government insurance (e.g., Medicare, Medicaid) because government insurance pays at fixed rates designed to compensate ARA for its services without providing ARA with windfall profits. ARA makes its largest margins off dialysis patients with commercial insurance, because commercial insurers typically reimburse for dialysis services in amounts that exceed government rates. In sum, ARA increases its profits by increasing the number of commercially-insured patients it treats.

82.     ARA has acknowledged this in its filings with the SEC, stating that "[w]e depend on commercial payors for reimbursement at rates that allow us to operate at a profit," that "[o]ur revenues are sensitive to the number of patients with commercial insurance coverage," that "[i]f the rates paid by commercial payors decline, our operating results and cash flows would be adversely affected," and that the company needed to "continuously obtain new patients covered by commercial insurance" to avoid adverse operating results, all while identifying one of the main risks to "[a]n investment in shares of our common stock" to be the "decline in the number of patients with commercial insurance or decline in commercial payor reimbursement rates[.]"

83.     ARA needs commercially-insured patients if it is to operate at a profit. It therefore focuses its business efforts on getting patients with commercial insurance referred to its clinics, billing those patients' commercial insurers at maximum amounts, figuring out ways to move patients on to (or keep them on) commercial insurance (despite their eligibility for Medicare and/or Medicaid), and persuading those patients to keep coming back to ARA clinics for dialysis services despite the fact that patients are obligated to pay more for care at non-network ARA facilities pursuant to their commercial insurance plans.

**The American Kidney Fund**

84.     The American Kidney Fund ("AKF") is registered as a tax-exempt, non-profit

organization under Section 501(c)(3) of the Internal Revenue Code. 26 U.S.C. § 501(c)(3). AKF

is based in Rockville, Maryland.

85.     Publicly, AKF states that its mission is to "help people fight kidney disease and

live healthier lives." (*See* AKF 2016 Form 990).

86.     Privately, AKF has become an arm of the for-profit dialysis industry, serving as a

conduit through which dialysis providers make payments to dialysis patients designed to induce

those patients to enroll in or stay enrolled in commercial insurance plans that pay the dialysis

providers the highest reimbursement rates.

87.     AKF did not always operate for the private benefit of for-profit dialysis

companies. Indeed, AKF was founded in 1971, and by 1995—twenty-five years after its

founding—it was still a relatively small, ostensibly legitimate charity, receiving less than $5

million a year in donations, with less than $500,000 of those donations coming from for-profit

dialysis providers.

88.     That began to change in 1997, when AKF and several for-profit dialysis

companies asked the Office of Inspector General ("OIG") to issue an advisory opinion allowing

AKF to start operating and expanding a program called the Health Insurance Premium Payment

("HIPP") program where it would take donations from the for-profit dialysis companies and use

them to pay the Supplementary Medical Insurance Program ("Medicare Part B") or Medicare

Supplementary Health Insurance ("Medigap") premiums of financially needy patients who were

enrolled in Medicare and being treated by the donating dialysis companies.

89.     AKF sought the OIG advisory opinion because it did not want to be subject to

civil monetary penalties under Section 231(h) of the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA"), which authorized the OIG to impose those penalties

against entities who offer remuneration to Medicare or Medicaid beneficiaries that they know or

should know will influence the beneficiary's decision to order or receive covered items or services from a particular medical provider.

90.     AKF did not disclose any intention to use the contributions of donating companies to pay their patients' EGHP, COBRA, or Affordable Care Act premiums, nor did it disclose how paying those premiums could impact donating companies' profits.

91.     Upon information and belief, ARA was not among the companies that sought the advisory opinion, because ARA did not exist at the time the opinion was requested.

92.     Ultimately, the OIG issued Advisory Opinion 97-1 which set forth guidelines that AKF and its donating companies would need to follow for AKF's HIPP program to avoid being subject to civil monetary penalties. In that Opinion, the OIG stated that AKF could not "earmark" "[c]ontributions … for the use of particular beneficiaries or groups of beneficiaries," "take into account the identity of the referring provider or the amount of any donation to AKF by such provider," or "assure" providers "that the amount of HIPP assistance their patients receive bears any relationship to the amount of their donations." The OIG also stated that providers could not "track the amounts that AKF pays on behalf of patients dialyzing at their facilities in order to calculate amounts of future contributions[.]" Finally, the OIG stated that AKF assistance should be "available to any financially needy ESRD patient regardless of provider" and should not be "limited to patients of the [donating] companies." The OIG also stated that Advisory Opinion 97-1 was "limited in scope to the specific arrangement described in this letter," had "no applicability to other arrangements, even those which appear similar in nature or scope," and "has no application, and cannot be relied on" by any entity that did not request it.

93.     Thus, subject to the restrictions and limitations of Advisory Opinion 97-1, AKF's HIPP program came into being.

94.     Today, 20 years later, AKF's HIPP program has metastasized into a profit-maximizing arm of AKF's dialysis company donors – something far different, and far less charitable, than the modest Medicare Part B and Medigap premium assistance program that was pitched to the OIG in 1997.

95.     In fact, AKF and a handful of large dialysis providers (including ARA) have turned AKF's HIPP program into a lucrative scheme, wherein the dialysis providers use AKF as a conduit to pay the commercial insurance premiums of patients dialyzing at their facilities, to induce them to enroll in or stay enrolled in the commercial insurance plans that pay the most lucrative reimbursement rates to the dialysis providers.

96.     By routing massive sums of money to their patients through a supposed "charity," dialysis providers (including ARA) are able to disguise from insurance companies the fact that they are paying their patients' premiums to induce those patients to continue receiving dialysis services on financial terms that are most favorable to the dialysis providers.

97.     AKF has made it clear that if providers want massive sums of money distributed to their patients, the providers need to "donate" corresponding sums of money to AKF's HIPP program.

98.     Indeed, upon information and belief, AKF has instructed and required providers to calculate and contribute sums to AKF that correspond to the amount of money those providers want or expect their patients to receive from AKF's HIPP program.

99.     This pay-to-play requirement is embodied in what AKF has called its "fair share" requirement and "Honor System."

100.    As recently as 2016, AKF had posted its HIPP Guidelines, which included a section describing the "HIPP Honor System" on its website. In that section, AKF set forth its requirement that "each referring dialysis provider should make equitable contributions to the HIPP pool" and that each provider should "reasonably determine its 'fair share' contribution to the pool [i.e., the funds available for premium assistance] by considering the number of patients it refers to HIPP." AKF emphasized that all providers had an "ethical obligation to contribute their respective 'fair share' to ensure that the HIPP pool is adequately funded." And AKF instructed providers that "[i]f your company cannot make fair and equitable contributions, we respectfully request that your organization *not refer patients to the HIPP program* ...." (emphasis added).

101.    The message from AKF could not have been clearer: if providers wanted AKF to use their "donations" to pay their patients' premiums, the providers needed to calculate and contribute amounts of money commensurate with the amount of money their patients would require for premium payments. And if providers did not contribute their "fair share" to AKF, they should not expect their patients to receive HIPP funding. One might wonder how dialysis providers are able to perform the calculations required by the AKF honor system. The answer is alarming and telling. AKF has required that dialysis patients not apply for AKF assistance without their provider's involvement. Rather, pursuant to AKF rules, only dialysis providers have been able to apply for assistance on a patient's behalf. Thus, upon information and belief, dialysis providers like ARA establish an "assembly line" intake process where (a) patients are told to forego Medicare and/or Medicaid in favor of commercial insurance, (b) ARA social workers and insurance counselors complete applications for AKF assistance for the patients, and (c) ARA workers calculate the commensurate "donation" ARA will need to make to AKF.

102.    To ascertain that AKF is now operating substantially and primarily for the private benefit of the nation's largest for-profit dialysis companies, one need look no further than AKF's Form 990 tax filings. In 2014, AKF collected cash contributions of $236,848,398 primarily from a handful of private donors and paid out $221,389,802 in premium assistance. In 2015, AKF collected cash contributions of $264,353,872 primarily from a handful of private donors and paid out $251,193,896 in premium assistance. And in 2016 AKF collected cash contributions of $308,829,440 primarily from just five private donors and paid out $285,525,417 in premium assistance to patients receiving dialysis services – presumably at clinics owned by those same five private donors.

103.    Upon information and belief, based on AKF's Form 990 tax filings, the 2014 cash contributions of approximately $88 and $100 million, the 2015 cash contributions of approximately $98 and $108 million, and the 2016 cash contributions of approximately $119 and $123 million came from DaVita, Inc. and Fresenius Medical Care—the two largest for-profit

dialysis providers in the country. Upon information and belief, annual cash contributions ranging from somewhere between $4 million and $16 million for 2014 through 2016 came from ARA.

104.    Recent investigative journalism has confirmed that AKF is now operating as alleged. For example, on December 25, 2016, the *New York Times* published an exposé on AKF and its relationship with dialysis providers, entitled "Kidney Fund Seen Insisting on Donations, Contrary to Government Deal." (*See*, Katie Thomas & Reed Abelson, *Kidney Fund Seen Insisting on Donations, Contrary to Government Deal*, THE NEW YORK TIMES (Dec. 25, 2016), https://www.nytimes.com/2016/12/25/business/kidney-fund-seen-insisting-on-donations-contrary-to-government-deal.html.)

105.    The article stated that "For years, … the Kidney Fund's preference for patients at the biggest clinics has been an open secret among many social workers," and noted that 78 percent of AKF's 2015 reported revenue of $264 million came from two dialysis providers – DaVita and Fresenius. The article also reported that AKF "has resisted giving aid to patients at clinics that do not donate money to the fund" and that those "actions have limited crucial help for needy patients at these clinics." Pointing out that "[t]he agreement governing the relationship between the group and [dialysis providers] forbids choosing patients based on their clinic," the article nonetheless reported that "[i]n multiple cases, the charity pushed back on workers at clinics that had not donated money, discouraging them from signing up their patients for assistance."

106.    The article also observed that, "[u]ntil recently, the Kidney Fund's guidelines even said clinics should not apply for patient aid if the company had not donated to the charity," quoting the guidelines as stating "[i]f your company cannot make fair and equitable contributions, we respectfully request that your organization not refer patients." And the article cited multiple examples of AKF demanding that dialysis providers "make a donation that at a minimum covered the amount [AKF] had paid for [a] patient's premium," threatening to cut off assistance for patients if such donations were not made, and, in some instances, refusing to pay

patients' monthly premiums until those patients' dialysis providers made their monthly contributions to the HIPP fund.

107.    Upon information and belief, AKF has also been operating in violation of the restrictions set forth in Advisory Opinion 97-1 by earmarking donating providers' contributions for the use of those providers' patients, taking into account the identity of the providers and the amount of those providers' donations to AKF in deciding whether to distribute funds to those providers' patients, assuring donating providers that the amount of HIPP assistance their patients will receive bears a relationship to the amount of the providers' donations, and restricting HIPP funds to patients of the donating providers.

108.    Overall, AKF is now being used by large dialysis providers (including ARA) to pay and disguise what amount to kickbacks and bribes to induce dialysis patients to enroll or stay enrolled in commercial insurance plans that pay the dialysis providers the highest reimbursement rates, and to induce patients to receive, and reward them for receiving, dialysis services from providers on terms that are in the providers' financial interest. Upon information and belief, AKF, ARA, and the other large dialysis providers conspire with one another on how to hide the scheme from insurers, how to secretively route incentive payments to patients, and how to aggressively grow the number of patients they can keep on or switch to commercial insurance plans, including commercial insurance plans offered by United.

109.    AKF is therefore operating not as a 501(c)(3) charity, but rather for the private benefit of a small number of large for-profit dialysis companies.

110.    Even ARA's own public disclosures suggest ARA is not donating to AKF to be charitable, but rather is contributing cash to AKF so that it can be funneled back to ARA's patients to serve ARA's private financial interests and maximize the amount of money ARA is able to extract from commercial insurers.

111.    For example, in its 10-Q for the quarterly period that ended June 30, 2017, ARA disclosed that there were several pending "challenges to kidney patients' use of [AKF] premium support," and stated that if any challenges were successful or if regulators were to impose

28

restrictions on the use of financial assistance from AKF, "our revenues, earnings and cash flow could be substantially reduced." ARA also disclosed that "[a]ny funding shortfall at a charity such as AKF or any other inability of such charity to make premium support payments could adversely affect our patients' and other providers' patients' ability to afford commercial insurance coverage, which could materially adversely affect our operating results and cash flows." And ARA disclosed that if any "patients are unable to obtain or to continue to receive AKF charitable premium support … the financial impact on our company could be substantially greater than the estimated annual financial impact … relating to patients previously enrolled in ACA plans," which ARA had estimated to be $25 million in 2017.

112.    Shockingly, ARA also disclosed in its public filings that its financial performance could suffer *if it was required to be more transparent with patients* and insurers. Specifically, in its 10-K for the fiscal year that ended December 31, 2016, ARA discussed the fact that the U.S. Department of Health and Human Services had issued an interim final rule that would require dialysis providers like ARA "to disclose to insurers for patients covered by [ACA] plans *that they are paying for premiums, directly or through a charity*, and receive an assurance from the insurer that the insurer will accept such premium payments for the entire year." (emphasis added.) ARA noted that CMS had indicated that it would consider prohibiting third-party premium payments if "the disclosure requirements *do not curtail current abuses*." (emphasis added.) ARA explained that, under the interim final rule, dialysis providers like ARA would have to provide patients with information about: (a) how certain marketplace plans will affect patients' costs and access to providers, services, and prescription drugs, (b) Medicare enrollment and benefits, (c) Medicaid eligibility and benefits, (d) penalties and potential coverage gaps associated with late enrollment in Medicare Part B or D, (e) the nature of the provider's contributions to premium payment organizations like AKF, and (f) the reimbursement the provider's facilities would receive for the coverage options available to the patients and whether premium payments are contingent on continued use of dialysis services or use of a particular facility. In other words, ARA would have had to provide patients with comprehensive, objective

information about all insurance options and cost factors – rather than misleading patients into enrolling in or staying on commercial insurance plans with AKF support. ARA made it clear that providing patients with all of this information could "adversely impact the enrollment of patients treated at our clinics" in commercial insurance plans "and could cause a reduction in our average reimbursement rates," and that "[a]dverse regulatory developments" could "materially adversely affect our business, results of operations and cash flows."

113.    AKF knows that ARA and other dialysis providers use AKF to disguise and route money for commercial insurance premiums to their dialysis patients. AKF also knows that ARA and other dialysis providers do this to increase their revenues, profits, and metrics that affect share price such as "commercial mix"—a measure of the percentage of overall dialysis treatments performed for patients with commercial insurance. AKF facilitates this scheme because it knows that if providers stop making money off their donations to AKF, they will substantially reduce their donations or stop donating altogether, threatening the existence of AKF and the substantial salaries it pays its executives like LaVarne Burton and Donald Roy, which have risen exponentially during the last several years.

### ARA's Scheme to Extract Exorbitant Sums from United

114.    Because ARA is out-of-network with United, it is often prohibitively expensive for United's commercially-insured dialysis patients to receive treatment from ARA, rather than one of United's many conveniently-located in-network dialysis providers. For this reason, patients typically elect to receive dialysis from in-network providers and many take advantage of the lower cost government plans available to the ESRD population.

115.    At the same time, ARA needs to maintain and increase the number of commercially-insured dialysis patients treating at its facilities in order to increase its profits. This was particularly true as ARA prepared to position itself for a successful IPO in 2016.

116.    Faced with this reality, ARA constructed a corrupt, deceptive, and unfair business model that relied on a variety of financial inducements—paid to its joint-venture nephrologists and its potential commercial patients—designed to keep commercial patients on its rolls when

they would otherwise migrate to government insurance plans and/or treat at more affordable, non-ARA, in-network facilities.

117.    Upon discovering that AKF was operating as a conduit for for-profit dialysis companies to pay their patients' premiums, United's Special Investigations Unit ("SIU") determined that an unusually high amount of money—hundreds of millions of dollars —had been paid in recent years to ARA for patients enrolled in United's EGHPs.

118.    The high dollars paid to ARA were particularly suspicious in light of the fact that (a) patients ordinarily avoid the high costs associated with non-network dialysis providers like ARA, (b) United's network dialysis providers were equally available to the patients ARA was treating (and generally more conveniently located for the patients), and (c) the patients were seeing United's network nephrologists—who had contractual obligations to coordinate patient care with other network providers and to educate patients on the financial burdens associated with out-of-network providers like ARA. The fact that thousands of United's commercially-insured patients selected high-cost, out-of-network ARA dialysis services simply made no sense.

119.    As United's SIU continued its investigation, it unearthed troubling patterns. Nephrologists who were network providers with United were systematically referring United members to expensive out-of-network ARA facilities. Those referring nephrologists had undisclosed lucrative ownership stakes in the out-of-network ARA clinics. ARA had been using AKF to pay United members' EGHP and COBRA premiums to induce them to stay on United's commercial insurance, instead of moving to more affordable Medicare and/or Medicaid plans. And ARA had been systematically waiving and failing to collect United members' out-of-network cost-sharing obligations to induce the members to stay on United's commercial insurance and continue receiving dialysis services from ARA on financial terms that were the most favorable to ARA. ARA had then been billing and collecting from United on claims and charges that were misleading, inflated, misrepresented, incomplete, and not payable.

***ARA Incentivizes, Induces, and Instructs its Joint Venture Nephrologist Partners
to Refer ESRD Patients Out-of-Network to ARA Clinics***

120.    ARA induces its joint venture nephrologist partners to refer commercially-insured
patients who need dialysis services (including United EGHP and COBRA plan members) to
ARA's non-network clinics through a number of means. Upon information and belief, ARA
performs due diligence to identify nephrologists who are treating a significant number of patients
enrolled in commercial insurance plans (including United plans). ARA then offers qualified
nephrologists lucrative opportunities to become joint venture partners with ARA by acquiring an
ownership interest in ARA clinics to which those nephrologists' patients would be referred. ARA
provides these opportunities to nephrologists on the understanding that the nephrologists will
refer their commercially-insured patients to ARA's clinics.

121.    Upon information and belief, several of United's current and former in-network
nephrologists have been targeted by ARA under this structure, including but not limited to: Dr.
Carl Goldsand, Dr. Bao Huynh, Dr. John Panos, Dr. Samerah Razuman, Dr. Carlos Francisco
Pena, Dr. Jose Nieto, Dr. Gerald Flores, Dr. Arys Celaya, Dr. Celestino Palomino, Dr. Jennifer
Bala, Dr. Nabila Niaz, Dr. Mohan Abraham, Dr. Sunila Pandit, Dr. Nita Shah, Dr. Daniel Barton,
Dr. Robert Orr, Dr. Lakhan Saha, Dr. Wesley Forgue, Dr. Lawrence Bressler, Dr. Gregory
Zollner, Dr. Barton Brezina, Dr. Clay Wilson, Dr. Davesh Patel, Dr. Harold Hubert III, Dr. Mark
Smith, Dr. Merritt Gadallah, Dr. Oscar Dominguez, Dr. Matthew Lingle Essen, Dr. Michael
Anger, Dr. Harmeet Singh, Dr. Jerald Boseman, Dr. Richard Halterman, Dr. Seth Levey, Dr.
Steven Kraft, Dr. Thomas Mooney, Dr. James Sterrett, Dr. Jesus Quintero, Dr. Joanna
Rodriguez, Dr. Julio Vijil Jr., Dr. Neil Weiner, Dr. Syed Hashmi, Dr. Jack Waterman, Dr.
Ronald Goldmin, Dr. Craig Shapiro, Dr. David Michal, Dr. James Smart Jr., Dr. James Baker III,
Dr. Michael Brumback, Dr. Muhammad Salahuddin, Dr. Ramesh Kotihal, Dr. Jia Liu, Dr.
Stephen Zemel, Dr. Jay Ocuin, Dr. Charles McCoy, Dr. Christopher Cosgrove, Dr. Daniel
Dragomire, Dr. George Lee, Dr. Ildiko Medve, Dr. Michael Thursby, Dr. Steven Zipin, Dr.
Joseph Romanello, Dr. Mark Mancini, Dr. Bhasker Mehta, Dr. Michael Jameson, Dr. Davinder

Singh, Dr. Stephen Chalmers, Dr. Victor Meltzer, Dr. Ajith Kuriakose, Dr. Mary Mcneer, Dr. Walid Abou-Assi, Dr. Frank Cosentino, Dr. Carlos Martinez, Dr. Srilakshmi Rebala, Dr. Nehal Subhash Dassani, Dr. Edward Fabelo II, Dr. Usman Lone, Dr. J. Peter Singh, Dr. Ganesh Shenoy, and Dr. Ankush Gulati. Upon information and belief, there are dozens of other United in-network nephrologists who have been targeted by ARA.

122. ARA structures its joint venture deals to induce referrals from its nephrologist partners. Specifically, ARA provides the nephrologists with an average non-controlling interest of 47% (with some as high as 49%), and agrees to pay the nephrologists a commensurate percentage of the clinics' profits or revenues. Thus, ARA structures its joint ventures to reward nephrologists for referrals: the more commercially-insured patients the nephrologists refer to the ARA clinics in which the nephrologists hold non-controlling interests, the more the nephrologists get paid. ARA thus not only pays nephrologists in exchange for referrals, it disguises those payments as "profit" distributions. All of this is intentionally hidden from United and, upon information and belief, United's customers and members. In other words, ARA knew that these nephrologists had contracted with United and agreed to accept network rates for all services, yet it convinced the nephrologists to become its joint venture partners so that the nephrologists could share in the profits realized from ARA's outrageously inflated out-of-network charges.

123. In fact, United's network contracts and administrative guides (incorporated into the contracts) require in-network nephrologists to act ethically and honestly when coordinating care by referring United members to other in-network providers whenever reasonably possible and, if not possible or if not acceptable to the member, to "verbally discuss [outpatient dialysis] care provider options and financial impacts with the member," "provide participating care provider alternatives and explain the reason for using the non-participating care provider," "discuss the financial impact of utilizing a non-participating care provider," and "complete the UnitedHealthcare Member Advance Notice Form if the member has elected to use the non-participating care provider." All of this is required so that "members may make informed choices

regarding their health care providers." The Member Advance Notice Form memorializes the verbal discussion and confirms, in writing, the member's informed decision – including his or her understanding of the attendant financial and care coordination implications. United's network nephrologists were required to keep a signed copy of the Member Advance Notice Form for each United member referred to an out-of-network ARA facility. However, none of the aforementioned nephrologists were able to produce Member Advance Notice Forms for any of their patients treating at the ARA dialysis facilities where the nephrologists have ownership interests. Instead, the nephrologists used different forms provided by ARA; forms that did not provide the patients with any of the information necessary to make informed decisions and that did not comply with the nephrologists' contractual obligations to United.

124.    ARA incentivized and, upon information and belief, instructed its joint venture nephrologist partners to refer United members who needed dialysis to ARA clinics, knowing that ARA was an out-of-network provider for all United members. ARA influenced its nephrologist partners to refer United members to ARA clinics knowing that the *nephrologists* were in-network providers with United and contractually required to refer patients to in-network dialysis clinics or complete Member Advance Notice Forms for all non-network referrals.

125.    Leading up to its 2016 IPO, ARA also induced nephrologists who were in a position to refer commercially-insured dialysis patients to enter into joint ventures with ARA by offering illegal "put" rights to the nephrologists. The put rights were designed to incentivize the nephrologists to refer as many commercially-insured patients to ARA's dialysis clinics (in which the nephrologist would hold an ownership interest) as possible in advance of the IPO.

126.    Recent lawsuits filed against ARA by these nephrologists establish that the "put-rights" ARA offered were illegal kickbacks. Indeed, in the lawsuits, the nephrologists explain how ARA offered the "put" rights, induced the nephrologists to enter into the joint venture relationships where their payment was proportionally tied to the profits of ARA clinics, and then refused to honor the "put" rights by informing the nephrologists that they violated the Federal Anti-Kickback statute.

127.    Specifically, ARA represented to the nephrologists that the payment formula that was at the heart of the IPO put rights was illegal and unenforceable under the Federal Anti-Kickback statute and that if the nephrologists tried to enforce the rights, they could be prosecuted for a felony and could lose their medical licenses.

128.    ARA's efforts and mechanisms to incentivize and induce referrals constitute kickbacks, which by their very nature constitute forms of unfair, deceptive, and fraudulent conduct.

129.    As early as 1989, the OIG issued a Special Fraud Alert about the type of joint ventures ARA appears to have created. The OIG observed "a proliferation of arrangements between those in a position to refer business, such as physicians, and those providing items or services for which Medicare or Medicaid pays." The OIG further observed that "[s]ometimes these deals are called 'joint ventures.' A joint venture may take a variety of forms: it may be a contractual arrangement between two or more parties to cooperate in providing services, or it may involve the creation of a new legal entity by the parties … to provide such services." The OIG explained that "[u]nder these suspect joint ventures, physicians may become investors in a newly formed joint venture entity" and "refer their patients to this new entity," and "[get] paid by the entity in the form of 'profit distributions.'" And the OIG concluded that "[t]hese suspect joint ventures may be intended … to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals." ARA appears to have ignored the OIG Fraud Alert in creating and maintaining its joint venture model that targets not only members of United's EGHPs, but also members of employee benefit plans offered by various government agencies, school districts, municipalities, counties, states, and government employee unions and pension funds.

130.    Indeed, ARA has publicly acknowledged the suspect nature of its joint ventures, stating in the April 22, 2016 Form 424B filed with the SEC by American Renal Associates Holdings, Inc. (among other SEC filings) that:

Our relationships with physicians and other sources of recommendations for our joint ventures are required to comply with the anti-kickback statute, among a variety of other state and federal laws and regulations. *We believe our JV arrangements satisfy many but not all of the elements of the federal anti-kickback statute safe harbors and may not meet all of the elements of analogous state safe harbors*. … We believe that our agreements do not violate the federal anti-kickback statute; however, since the arrangements do not satisfy all of the elements for safe harbor protection, these arrangements could be challenged. See "Risk Factors— Risks Related to Our Business—Our arrangements and relationships with our physician partners and medical directors do not satisfy all of the elements of safe harbors to the federal anti-kickback statute and certain state anti-kickback laws and, as a result, may subject us to government scrutiny or civil or criminal monetary penalties or require us to restructure such arrangements." (emphasis added.)

131.    Of course, the reality is that ARA's joint venture model is not legal. As the OIG predicted, the incentives provided to ARA's joint venture nephrologists resulted in large numbers of referrals to out-of-network ARA dialysis clinics—referrals that were not in the patients' best interests.

### *ARA Uses AKF as a Conduit to Pay its Patients' Premiums and Induce Them to Retain Commercial Insurance and Obtain Treatment on Terms that Serve ARA's Financial Interest*

132.    ARA knew that its profiteering scheme would fail if EGHP members elected to obtain Medicare and/or Medicaid plans, rather than enrolling or staying enrolled in what ARA believed were lucrative United commercial plans it could target and exploit for profit.

133.    Once patients are referred to ARA for dialysis services, they often have the ability to enroll in Medicare to continue receiving the dialysis services and related healthcare treatments they need.

134.    Enrolling in Medicare often is in the best interest of the patient for several reasons, including affordability. This was particularly true for the United's EGHP members who were referred to out-of-network ARA clinics for treatment, given that ARA frequently charged as much as $4,473, $5,815, $6,709, and $7,753 for a single dialysis session for a commercial member. Because ESRD patients require dialysis three times per week, and because their share of ARA's out-of-network costs could be 20, 50, 70, or even 100 percent, it made little sense for patients to forego available Medicare coverage and more affordable in-network providers.

135.    And yet, ARA has publicly and consistently acknowledged that a "decline in the number of patients with commercial insurance or decline in commercial payor reimbursement rates" present the main risks to its profitability. This meant that ARA had to convince its patients to stay on EGHPs when they would otherwise have transitioned to Medicare.

136.    To accomplish this, ARA funneled millions of dollars through AKF and back to its patients to pay the patients' EGHP and COBRA premiums.

137.    ARA's arrangement with AKF was a pay-to-play relationship, where substantial payments from ARA to AKF were required if ARA wanted AKF to route that money back to ARA patients under the guise of "charitable" grants. ARA's payment scheme with AKF induced patients to (a) remain on EGHPs or COBRA, and (b) continue receiving dialysis at ARA clinics. Of course, this all allowed ARA to bill United millions of dollars for dialysis services that otherwise would never have been billable to United. It also allowed ARA to improperly protect its profits.

138.    As described above, AKF made it clear that if ARA wanted AKF to make "charitable" premium assistance "grant" money available to ARA patients, ARA had to pay AKF substantial sums to fund those "grants" on a regular basis. In other words, ARA had to pay AKF to route ARA "donations" back to ARA patients, for ARA's financial benefit. ARA calculated its "donations" to AKF to correspond with the amount of premium payment money it wanted and expected its patients to receive, and AKF then distributed those "donations" back to ARA's designated patients.

139.    Simply put, AKF distributed those contributions back to ARA's designated patients *because* ARA contributed the money in the first instance.

140.    As discussed herein, United's SIU interviewed many members with ESRD enrolled in United's EGHPs and COBRA plans who had been referred to ARA's out-of-network facilities and were continuing to receive services from those facilities. A majority of these members reported that ARA had connected them with AKF money and that some or all of their United plan premiums were being paid for with money coming from AKF/ARA.

37

141.    ARA has used AKF in this manner not only to pay its patients' premiums and induce them to retain commercial coverage (despite the availability of more affordable Medicare and Medicaid coverage), but also to disguise its misconduct and prevent United and other insurers from being able to ascertain which of their members were having their premiums paid for by AKF/ARA.

142.    ARA's "donations" to AKF and premium payments to patients are kickbacks, bribes, and illegal remuneration, are designed to generate a private financial benefit for ARA, and are not charitable by any measure.

143.    ARA's relationship is also inconsistent with, and not sanctioned by, Advisory Opinion 97-1, because ARA is not immunized by that Opinion and because, even if it were, ARA and AKF's conduct violates the restrictions set forth in that Opinion.

144.    United, its plans, and the plan sponsors have been duped into wrongfully paying millions of dollars for dialysis services rendered by ARA, on claims tainted by improper inducements. As noted herein, self-funded plans offered by various government agencies, school districts, municipalities, counties, states, and government employee unions and pension funds have also been targeted by ARA's improper conduct.

### ARA Induces its Patients to Retain Commercial Insurance and Continue Treating at ARA's Out-of-Network Facilities by Waiving the Patients' Cost-Sharing Obligations

145.    Even though ARA was paying its patients' premiums (using AKF to wash the premium payments of their true origin), ARA knew that its profiteering scheme would still fail if patients enrolled in United's commercial plans were held financially responsible for any portion of the frequent, expensive, and aggressively-priced dialysis services they received at ARA's out-of-network facilities. After all, as detailed above, ARA and the nephrologists had worked to keep the outrageous nature of ARA's costs hidden from the patients, in direct violation of United's network contracts with the nephrologists.

146.    ARA knew that it needed to eliminate all of the financial incentives for United's members to use network providers for their dialysis services rather than ARA.

147.     To induce United members to forgo the significant cost-saving benefits of using network providers, and to continue receiving services from ARA while enrolled in United plans, ARA systematically promised to waive and/or not collect United members' cost-sharing obligations – including deductibles, coinsurance, copays, and any balance bills – so long as the members continued to receive dialysis treatments from ARA. ARA systematically promised United members that they would not be responsible for any out-of-pocket costs and that ARA would accept as full payment whatever amounts United would pay.

148.     Consistent with its promises to United members to waive and/or not collect member responsibility amounts, ARA did in fact fail to collect these amounts from the United members.

149.     Through this conduct, ARA induced United members to receive dialysis services from ARA facilities when the members otherwise would have sought treatment from a conveniently-located and less expensive network provider that would have been less costly for both the member and the United plan.

150.     ARA's conduct also induced members to remain on commercial insurance instead of enrolling in more affordable Medicare and/or Medicaid plans for which they were eligible.

151.     As discussed above, United's SIU interviewed many members with ESRD enrolled in United's fully-insured and ASO EGHP and COBRA plans who had been referred to ARA's out-of-network facilities and were continuing to receive services from those facilities. Almost every one of these members reported that they had not made any out-of-pocket payments to ARA.

152.     The routine waiver of patient's cost-sharing obligations is widely recognized to be inappropriate, unethical, and unlawful.

153.     Indeed, many states have recognized that schemes like the one ARA has employed victimize health insurers and their insurance plans, including customers who sponsor some of the plans and the members who are enrolled in them, and exponentially increase the cost of healthcare to the entire population. Many state laws prohibit providers from waiving patients'

cost-sharing obligations. For example, Florida law provides that it is insurance fraud for any services provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if the provider has agreed with the insured or intends to waive deductibles or copayments or does not intend to collect the total amount of the charge. Fla. Stat. § 817.234 (7). Idaho law provides that it is unlawful for a service provider to engage in a regular practice of waiving, rebating, giving, paying, or offering to waive, rebate, give, or pay all or part of a claimant's deductible or claim for health insurance. Idaho Code Ann. § 41-348(a)(2). Texas law declares that physicians and healthcare providers may not waive deductibles or co-payments by acceptance of an assignment of healthcare benefits. Tex. Ins. Code Ann. § 1204.055(b). Colorado law states that a business practice that has the effect of eliminating the need for a patient to pay required copayments and deductibles interferes with the contractual obligations between the insurer and its insured. Colo. Rev. Stat. § 18-13-119(1)(a). Georgia law classifies the waiving or advertising of the waiving of a deductible or co-payment as a deceptive or misleading practice which could justify the denial or revocation of a state medical license. Georgia: O.C.G.A. 43-1-19.1(a). Illinois law makes it unlawful for any licensed person to knowingly advertise acceptance of the amount a third-party payor covers as payment in full for services rendered by assignment, if the effect is to give the impression of eliminating the need of payment by the patient of any required copayment or deductible applicable in the patient's health benefit plan. 225 I.L.C.S. 60/27. Nevada law states that a medical facility shall not waive a deductible or copayment if the medical facility is not a preferred provider of healthcare and the waiver would reduce the financial effect of a preferred provider's incentive or disincentive to its insureds. And South Dakota law makes it a misdemeanor and "abuse of health insurance" for a person who provides healthcare, as a regular business practice, to knowingly accept from any third-party payor, as payment in full for services rendered, the amount the third-party payor covers, or submit a fee to a third-party payor which is higher than the fee he has agreed to accept from the insured with the understanding of waiving the required deductible or copayment, if the effect of either business practice is to eliminate the need for payment by the

insured of any required deductible or co-payment applicable in the insured's health benefit plan. S.D.C.L. 58-17-57.

154.    Moreover, ARA's own "Code of Ethics and Conduct" acknowledges that ARA is prohibited from using improper inducements and states that ARA cannot "attract patients by routinely waiving copays and deductibles, or by providing or promising benefits, payments, gifts or other things of value."

### Interviews with United Members Treating at ARA's Facilities Confirm ARA's Scheme

155.    In an effort to determine how United members with ESRD who are enrolled in United's EGHPs were induced to not only start treating but continue treating at ARA's out-of-network facilities, United's SIU interviewed several of these members. The members consistently reported that ARA had employed the improper tactics discussed herein. Specifically, the members reported that their nephrologists had referred them to ARA, and reported that these nephrologists either told them ARA was their best option or presented ARA as their only option, even though in each case, available in-network, non-ARA, lower cost dialysis facilities were within a few miles of the members' homes. These nephrologists also tended to own lucrative portions of ARA's dialysis facilities. Unfortunately, because the nephrologists did not comply with their contractual responsibilities, including but not limited to completion of the Member Advance Notice Forms, members were never given the opportunity to make informed decisions about where they received their dialysis services. The members United's SIU interviewed also reported that ARA had been working with AKF to pay their commercial insurance premiums, and that ARA had been waiving and failing to collect their cost-sharing obligations.

156.    For example, one United member (hereafter "United Member 1") was enrolled in the Health Savings Plan—an ASO plan administered by United. She reported that her United network nephrologist, who owned an ARA-affiliated dialysis facility, referred her to that facility (which was 2.4 miles from her house) without giving her any other options for where to receive dialysis. An in-network facility was located within .09 miles of her residence. United Member 1

further reported that she has not paid any copays, coinsurance, or other out-of-pocket expenses to ARA, and that her premium payments were being made with money from AKF.

157.    Another member ("United Member 2") was enrolled in the Choice Plus plan—an ASO plan administered by United. He reported that he was referred to ARA by his United network nephrologist during the time he was hospitalized, and was not told about the option or availability of any other dialysis clinics. An in-network facility was available and was the same distance from the member's residence as the ARA facility. Based on information published by CMS, the in-network facility ranks higher in quality than the ARA facility to which he was referred. United Member 2 further reported that, over the past year, he has made only one copay to ARA, and that ARA helped him get his premiums paid with money from AKF.

158.    Another member ("United Member 3") was enrolled in the Choice Plus plan—an ASO plan administered by United. She reported that she was referred to ARA for dialysis by her United network physician. The ARA facility was 10 miles from her home. An in-network facility was located 1.6 miles from her residence. United Member 3 further reported that she has not paid any copays, coinsurance, or other out-of-pocket expenses to ARA, and that ARA helped her get part of her premiums paid with money from AKF.

159.    Another member ("United Member 4") was enrolled in the Choice Plus plan—a United fully-insured plan. He reported that his United network nephrologist referred him to an ARA facility (that was 5.7 miles from his home) during the time he was hospitalized. An in-network facility was located within 2.6 miles of the member's residence. United Member 4 further reported that ARA told him not to worry about any out-of-pocket financial responsibility. He further reported that AKF was paying his commercial plan premiums.

160.    Another member ("United Member 5") is a resident of Massachusetts and a member of the Group Benefit plan—an ASO plan administered by United. She reported that she was sent by her United network nephrologist to two different ARA clinics that were 16.2 and 11.8 miles from her home. There was an in-network dialysis facility located only within 3.3 miles of the member's home. United Member 5 further reported that, over the past year, she has

not paid any copays, coinsurance, or other out-of-pocket expenses to ARA and, in fact, ARA staff actually misrepresented to her that ARA was in-network with United. She further reported that ARA helped her get set up so her premiums were being paid with money from AKF. Finally, she reported that ARA staff actively worked to convince her not to move to a closer, more affordable, in-network facility once she learned that ARA was out-of-network.

161.     Another member ("United Member 6") was enrolled in the Choice Plus plan—an ASO plan administered by United. He reported that he was referred to Ameri-Tech Kidney Center, an ARA facility that lists United network Drs. Jameson, Meltzer, Singh, and Chalmers, as well as Joe Carlucci (ARA's CEO), as members. United Member 6 was referred to Ameri-Tech by Dr. Jameson and was never given any other choices. He was not told Ameri-Tech was out-of-network with United. Ameri-Tech was 5.6 miles from the member's home. An in-network dialysis facility was .6 miles from the member's residence. Based on information published by CMS, the in-network facility ranks higher in quality than the ARA facility to which he was referred. United Member 6 reported that he never was asked to make a copay, or coinsurance or deductible payment to the ARA facility. United Member 6 also explained that his ARA social worker takes care of his premium payments in coordination with AKF. United Member 6 was not told that his nephrologist had an ownership stake in the ARA clinic.

162.     Another member ("United Member 7") was enrolled in the Choice Plus plan—an ASO plan administered by United. He reported that he remains enrolled in his United ASO plan through COBRA. United Member 7 reported that when he needed to start receiving dialysis treatments, he was referred by his United network nephrologist to an ARA facility for those treatments—a facility that was in the same building as his nephrologist's office. His nephrologist did not discuss this referral or any other options to receive dialysis treatments at any different dialysis clinic. And his nephrologist did not tell him at any time that ARA was out-of-network with United. ARA also never told him that it was out-of-network with United. To get to the ARA clinic to which he had been referred, he needed to drive 15 miles one-way from his residence, which amounted to 30 miles round trip for each treatment. United Member 7 reported that these

43

trips would leave him feeling exhausted by the time he returned home. No one—not his United network nephrologist and not ARA—ever told him that there was an in-network dialysis clinic approximately 1 mile from his residence. Based on information published by CMS, the in-network facility ranks higher in quality than the ARA facility to which he was referred. After receiving approximately five dialysis treatments from ARA, United Member 7 learned from United that ARA was not in United's network, at which point United Member 7 completed two more treatments at ARA before switching to a DaVita clinic that was in-network with United. He further reported that, during the time period before he switched to a DaVita clinic, ARA did not charge him any copayments for dialysis and ARA arranged to have his premiums paid with money from AKF. However, after the member switched to DaVita, ARA penalized him by sending him a bill for the previously waived cost-share that astonishingly totaled approximately $10,000.

163.    Another member ("United Member 8") was enrolled in the Choice Plus plan—a fully-insured United plan. He was referred to an ARA facility by his United network nephrologist without ever being told of the doctor's ownership interest in the clinic, without being given choices of in-network clinics, and without being told about the financial consequences of out-of-network facilities. The ARA facility was 5.2 miles from his home and there was an in-network facility just 2 miles from his house. United Member 8 reported that he never made any out-of-pocket payments to ARA for his dialysis services.

164.    Another member ("United Member 9") was enrolled in the Choice Plus plan—a fully-insured United plan. He was referred to an ARA facility by his United network nephrologist without ever being told of the doctor's ownership interest in the clinic, without being given choices of in-network clinics, and without being told about the financial consequences of out-of-network facilities. The ARA facility was the same distance from the member's home as an in-network dialysis clinic. United Member 9 reported that he never made any out-of-pocket payments to ARA for his dialysis services. He was told that his nephrologists would not continue to treat him if he went to another dialysis clinic. United Member 9 recounted

how his ARA social worker completed paperwork so that his EGHP premiums would be paid by AKF.

165.    These exemplar United members represent just a small fraction of the members and plans that have been targeted by ARA's misconduct. Indeed, United believes ARA has directed its scheme at more than 2,000 members enrolled in United EGHP and COBRA plans, and its actions have been wanton, willful, intentional, and malicious.

166.    As a result of ARA's unlawful actions, United and its customers have paid out millions of dollars for out-of-network dialysis services provided to patients that should never have been at ARA's clinics.

### ARM Fraudulently Bills United, Submits False Claims that Contain Inflated Charges, and Misrepresents/Conceals that Members' Cost-Sharing Obligations Have Been Waived

167.    United receives millions of healthcare claims per day and endeavors to adjudicate, process, and pay them expeditiously. United reasonably relies on the truth, accuracy, and completeness of the claims submitted by providers for services rendered to United members.

168.    ARM knows this, and tries to take advantage of United's efforts to process claims expeditiously. ARM does this by repeatedly submitting high volumes of misleading claims containing misrepresentations and inflated charges in an effort to induce United into approving and making payments that it otherwise would not approve. ARM does this to mislead United about its systemic waiver of patients' cost-sharing obligations and promises to not charge patients enrolled in United's commercial plans for the dialysis services they receive at ARA facilities. ARM also conceals and fails to disclose its practices to United.

169.    ARM submits claims to United using standard forms (such as UB-04 claim forms and CMS-1500 claim forms), and their electronic equivalents. These forms are approved and generated in connection with the federal Medicare program, and it is common in the healthcare industry for these same forms to be used in connection with other governmental and commercial insurance. The forms require providers to describe the services provided and the procedures

performed using certain mandated coding regimes. The forms also require providers to set forth their "Charges" for each service or procedure and to list the "balance due" or "est. amount due."

170.    The UB-04 form, which ARM has utilized to submit the vast majority of claims to United, also contains certifications to which ARM attests when it uses the form to bill United for dialysis services. Specifically, the UB-04 forms state that: "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete" and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." This, among other things, obligates ARM to not misrepresent its charges or mislead or conceal from United its billing practices or material information that ARM knows bears on United's ability to determine whether the claims being submitted are payable and, if so, in what amount.

171.    Moreover, ARA's own "Code of Ethics and Conduct" acknowledges that, "As healthcare providers, we have a special obligation to ensure accurate information in patient medical and billing records," that "[a]ccurate documentation is essential to quality patient care, and to compliant billing," and that ARA must "submit claims that accurately represent the items and services provided" and "comply with payor requirements."

172.    ARM thus understands that when it uses claim forms (or their equivalents) to submit charges to United, it is representing that its charges are accurate and payable, and that United relies on the facts, charges, and certifications in the claims ARM submits in deciding whether, and in what amount, to pay the claims.

173.    Nevertheless, the claims ARM submits to United contain material misrepresentations, inflated, inaccurate, and misleading charges, incomplete information, and untrue certifications.

174.    The charges listed on a claim form are supposed to represent the amount the provider purports to have charged the patient/member for medical services (including the patient/member's cost-sharing obligations). When ARA decides to waive the United members' cost-sharing obligations, ARA effectively reduces the amount they are charging for the services

rendered by the amount of the waived cost-sharing obligations. The charges submitted to United should have been reduced by the considerable amounts of cost-sharing obligations that had been waived. But the claims submitted to United never accounted for these reductions. Instead of reducing the amount of its charges by the amount of the considerable cost-sharing obligations that had been waived, ARM submits claims to United that list amounts of "charges" that include the amounts United's members were responsible for paying, even though ARA has told the United members that those amounts would be waived, has not collected the amounts, or does not intend to collect the amounts. In so doing, ARM submits overstated, inaccurate charges that cause United to pay more on the claims than it otherwise would pay had it known of the patient discounts.

175.    This systemic and routine waiver of cost-sharing obligations, coupled with the submission of full charges, has long been identified as a fraudulent and abusive practice within the healthcare industry. In fact, as early as 1994, the Department of Health and Human Services Office of Inspector General issued a special fraud alert noting that the "[r]outine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare." *See* Office of the Inspector General, OIG Special Fraud Alert (May 1991), *Routine Waiver of Copayments and Deductibles under Medicare Part B*, *reprinted in* 59 Fed. Reg. 65372, at *65374 (Dec. 19, 1994). Indeed, this long-standing HHS-OIG guidance succinctly explains the fraudulent nature of ARA's claims: "if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item." *Id*. Numerous courts throughout the country have held that this basic analysis applies equally to billing and the routine waiver of patient responsibility in the commercial health benefit context.

176.     The claims that ARM submits to United for dialysis services rendered to ARA patients also do not represent accurate, actual charges for the services rendered. Rather, the charges ARM submits are inflated and overstated for other, independent reasons. Upon information and belief, the charges ARM has submitted to United for dialysis services greatly exceed the value ARA places on those services and the amount ARA actually expects to get paid for those services. Upon information and belief, rather than billing United charges that reflect what it expects to receive, ARA bills charges inflated by orders of magnitude above those amounts, hoping United will base payment on the listed amount and that the inflated amounts will induce United to pay higher amounts on the claims. Moreover, at the time it submits claims, ARM knows that it has not and will not charge its patients the amounts stated in the claims, or anything whatsoever, for the services being billed to United. ARM's charges are thus phantom charges that ARM never intends to collect from the patients, but that it submits to United anyway simply because the patient has commercial insurance. ARM also knows its charges and claims are not payable, because it knows that it has waived the deductibles of the patients it is treating and has agreed to provide dialysis services to them at no cost. Nevertheless, it submits its claims and charges to United anyway, representing that it is entitled to be reimbursed for the claims, in an attempt to mislead United into paying the claims based on the stated amounts. Upon information and belief, ARM does not engage in the same conduct with regard to patients insured by Medicare because it knows that doing so would violate the False Claims Act and the Anti-Kickback Statute. It nevertheless believes that it is free to mislead commercial insurers in whatever manner suits its financial interests.

177.     Finally, in submitting the claims, ARM untruthfully represents and certifies that the claims are true, accurate, and complete, and that it has not knowingly or recklessly disregarded, misrepresented, or concealed material facts. Indeed, as United's investigation has revealed, ARM does exactly what it certifies it does not do—billing United false and inflated charges while knowingly disregarding and concealing that ARA has been systemically paying its

patients' premiums and using promises of free dialysis and waivers of required out-of-network deductible/coinsurance obligations to generate false, inflated, and unpayable charges.

178.    ARM also understands that it can deceive United when billing United by failing to disclose all material facts, such as the facts that ARM has not and will not collect any deductibles or coinsurance obligations. ARM understands that this conduct deceives United into making payments that it otherwise would not have made, and yet ARM engages in it anyway.

179.    Moreover, in addition to being fraudulent, routine waivers of member cost-sharing obligations by providers generally render claims submitted to any United plan not payable. Under the provisions of most health plans insured or administered by United, benefits are not provided for health services for which member cost-sharing obligations are waived by out-of-network providers, or for which members have no legal responsibility to pay.

180.    As discussed above, the United plans ARA has targeted require the members enrolled in those plans to pay, directly to their provider, any member responsibility amounts, including deductibles, coinsurance, and copays. The plans state that no benefits are provided or payable for health services for which a non-network provider waives the United member's responsibility amounts. And the plans make it clear that funds must be refunded if benefits are paid for expenses incurred on account of a member if he or she did not pay all or some of the expenses (such as when a provider waives cost-sharing obligations and agrees to accept whatever payment the insurance company will pay as full payment for all services), or if the member did not legally have to pay all or some of the expenses.

181.    ARA's conduct rendered claims it submitted not payable, meaning that ARA received substantial sums for dialysis services that were not, in fact, covered by the health benefit plans.

182.    As a result of ARA's conduct, United and its customers paid out millions of dollars for dialysis services rendered by ARA to patients when in reality the claims were fraudulent and/or not for services that were covered and payable.

183.    United has attached Exhibit A, a non-confidential version of a spreadsheet with confidential information redacted, that sets forth a sample of claims for services rendered to some of the exemplar United members discussed herein for whom ARA has waived or otherwise failed to collect member cost-sharing obligations and submitted fraudulent, inflated claims. Exhibit A also lists claims for some of the exemplar members that were paid on the assumption that the required deductible and/or coinsurance amounts for other and/or preceding claims were being collected from the members by ARA. In so doing, Exhibit A illustrates how, by waiving a member's deductible and coinsurance obligations for certain claims and misrepresenting/misleading United about the fact that those obligations were being waived and not charged to the members, ARA can extract exorbitant sums from United on subsequent claims for those members.

184.    For each claim in Exhibit A, United lists the United member to whom dialysis services were rendered, the ARA facility where the dialysis service being billed for was rendered, the date of the service, the date the claim was received by United, the date the claim was paid by United, the procedure code, the procedure description, the charged amount, the member's coinsurance and deductible amounts, and the amount paid by United. Exhibit A does not depict every fraudulent claim, or every United member for whom ARA has caused a fraudulent claim to be submitted, pursuant to the scheme described herein. United is continuing to uncover additional members who have been targeted by ARA's scheme and additional claims that were fraudulent and not payable. Discovery from ARA's records will uncover many additional members ARA has targeted with its scheme and hundreds of additional instances where ARA waived or failed to collect required cost-share amounts, but nonetheless submitted fraudulent and misleading claims to United.

185.    ARA continues to engage in the misconduct described herein, and continues to actively conceal the nature and extent of its unlawful scheme.

## COUNT I—FRAUD (ARM only)

186.     United incorporates by reference paragraphs 1 through 185 as if fully set forth herein and further alleges as follows.

187.     ARM knowingly and willfully executed a scheme to defraud United by submitting fraudulent claims for dialysis services rendered to United members.

188.     ARM had an independent duty to submit honest, accurate, and complete claims that did not misrepresent, disregard, or conceal any facts material to United's decision about whether the claims were payable and, if so, in what amount.

189.     The claims ARM submitted and caused to be submitted misrepresented material facts in several respects. First, the claims listed inflated and misrepresented "charges" that included member cost-sharing obligations when, in fact, ARA LLC and ARM had systemically waived and/or agreed to waive those cost-sharing obligations. Second, the claims listed phantom "charges" that, upon information and belief, were also inflated far above the value ARA LLC and ARM placed on the listed services and the amount ARA LLC and ARM expected to get paid for those services. Third, ARM, in submitting the claims, told United to reimburse it for the charges and represented that it was entitled to be paid on those charges, knowing that it was not entitled to be paid on those charges. Finally, in submitting the claims, ARM untruthfully represented and certified that the claims were true, accurate, and complete, and that it had not knowingly or recklessly disregarded, misrepresented, or concealed material facts. Indeed, United's investigation revealed that ARA LLC and ARM did exactly what they certified they had not done—billed United false and inflated charges while knowingly disregarding and concealing that ARA had been systemically paying its patients' premiums and using promises of free dialysis and deductible/coinsurance waivers to generate the false, inflated, and unpayable charges.

190.     These misrepresentations were material to United's determination of whether the claims were payable and, if so, in what amount.

191.    At the time ARM's misrepresentations were made, ARM knew they were misleading and false. Nevertheless, ARM submitted and caused to be submitted the claims to United with the intent to defraud United by inducing United to pay the claims and to use the misrepresented charges and untruthful certifications as the basis for determining whether and how much to pay in reimbursement. ARM knew United would be relying on ARM's representations, including this information in claim forms, when determining whether to pay the submitted claims, and in what amount.

192.    United reasonably and justifiably relied on ARM's material misrepresentations in paying the false, inaccurate, incomplete, and misleading claims, and, as a direct and proximate result of ARM's conduct, suffered compensable injury. United and the United plans have been harmed by paying ARA amounts that would not have been paid had United known of ARM's misrepresentations and fraud, and that are far in excess of what should have been paid.

193.    By virtue of the foregoing, United is entitled to compensatory damages, including consequential damages, punitive damages, interests and costs, an injunction prohibiting ARA from continuing to engage in the tortious conduct described above, and any other legal and equitable relief deemed just and proper.

## COUNT II—NEGLIGENT MISREPRESENTATION (ARM only)

194.    United incorporates by reference paragraphs 1 through 190 as if fully set forth herein and further alleges as follows.

195.    As described in paragraph 189 above, ARM supplied false and inaccurate information and made material misrepresentations in the claims it submitted to United.

196.    ARM also failed to exercise reasonable care or competence in obtaining or communicating the information and representations.

197.    These misrepresentations were made in the course of ARA's business for the guidance of United in the transactions involving United deciding whether (and in what amount) to pay claims for ARA's dialysis services.

198.    United justifiably relied on these misrepresentations in processing and paying the claims, and United and its plans suffered pecuniary loss as a result. By virtue of the foregoing, United is entitled to compensatory damages in an amount to be proven at trial.

## COUNT III—TORTIOUS INTERFERENCE WITH CONTRACT

199.    United incorporates by reference paragraphs 1 through 185 as if fully set forth herein and further alleges as follows.

200.    ARA's conduct constitutes tortious interference with a contractual relationship.

201.    United members were referred to ARA by nephrologists who are parties to contracts with United.

202.    These contracts require the nephrologist to either "refer customers only to other network physicians and providers" or "use reasonable commercial efforts to direct [United members] only to other providers [including dialysis facilities] that participate in United's network." United's Administrative Services Guide, which is incorporated into these nephrologist contracts, reinforces these requirements and further obligates nephrologists to utilize certain protocols when referring patients to out-of-network providers like ARA, including but not limited to completion of the Member Advance Notice Forms.

203.    ARA knew or reasonably should have known that their nephrologist partners' contracts contained these requirements. Indeed, upon information and belief, the nephrologists' in-network status with United made them a prime target for ARA as that status meant that the nephrologists likely had a high number of commercial patients which, upon the consummation of a joint venture with ARA, could serve as a pool of patients to refer to ARA for dialysis to increase ARA's "commercial mix" and commercial revenues—key metrics that ARA routinely discusses with its investors and measures ARA was consciously trying to improve as it prepared for its IPO.

204.    Despite this knowledge, ARA intentionally procured the breach of these contracts by incentivizing, inducing, and instructing the nephrologists to refer their United members out-

of-network to ARA for dialysis services without completing the Member Advance Notice Forms or, for that matter, even discussing in-network provider options or out-of-network cost-share issues with patients.

205.    ARA's procurement of these breaches was without justification or privilege, and was done to undermine the structure, function, and existence of United's network and network contracts. Moreover, ARA's procurement of these breaches was accomplished through wrongful and illegal means, including through the use of kickbacks.

206.    The breaches ARA has caused have directly and proximately resulted in significant damages to United in the form of unnecessary payments United made to ARA subsequent to those breaches that would not have otherwise been made.

207.    By virtue of the foregoing, United is entitled to compensatory damages, including consequential damages, punitive damages, interest and costs, an injunction prohibiting ARA from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT IV—VIOLATION OF MASS. GEN. LAWS. ch. 93A

208.    United incorporates by reference paragraphs 1 through 185 and 189 as if fully set forth herein and further alleges as follows.

209.    Massachusetts General Laws Chapter 93A proscribes those engaged in trade or commerce from employing "unfair methods of competition and unfair or deceptive acts or practices" in business transactions. Mass. Gen. Laws ch. 93A § 2; *see also* Mass. Gen. Laws ch. 93A § 11.

210.    ARA, a business that engages in the conduct of trade or commerce, has perpetrated unfair and deceptive acts and practices as described herein.

211.    ARA has perpetrated this conduct willfully and knowingly.

212.    These unfair and deceptive acts and practices include: using kickbacks, prohibited remuneration, and other means to induce nephrologists to refer patients enrolled in United's

plans to ARA's non-network clinics without adhering to United's established protocols and contractual requirements, routinely promising to waive and waiving the patient financial responsibilities of United members to induce them to remain enrolled in United's plans and obtain dialysis services from ARA rather than conveniently-located and more affordable in-network providers, paying and using AKF to pay kickbacks and funnel remuneration to ARA patients to induce them to forego government insurance and enroll or remain enrolled in United's commercial plans and to seek dialysis services from ARA on terms that serve ARA's financial interest, using AKF as a conduit to disguise ARA's efforts to pay its patients' United premiums, misusing a purported charity for its own private financial gain and making "charitable" contributions designed to maximize profits, submitting misleading, inaccurate, and incomplete claims to United containing misrepresented charges that ARA knew were not payable, billing United knowing it had not collected patients' deductibles and coinsurance amounts and without disclosing that it systematically waived those cost-sharing obligations, and billing United for services tainted by the misconduct alleged herein.

213.    ARA's unfair and deceptive acts and practices have occurred primarily and substantially within the Commonwealth of Massachusetts. Indeed, ARA operates and manages its dialysis business, including its joint venture clinics, from its headquarters in Massachusetts and, on information and belief, all decisions made to create the scheme and all conduct to execute the scheme emanated from or occurred in Massachusetts.

214.    As a result of ARA's unfair and deceptive acts and practices, United has suffered a loss of money in the form of payments made to ARA for dialysis services, and continues to be threatened with the risk of losing money in the form of payments made to ARA for dialysis services.

215.    Accordingly, United is entitled to the actual damages it sustained due to ARA's conduct, including the full amount of the payments made to ARA on the claims afflicted by ARA's unfair and deceptive acts, up to triple, but not less than double, the amount of these damages.

216.    United is also entitled to be awarded its reasonable attorneys' fees and costs incurred in this action, and an order enjoining ARA from continuing to engage in any of the unfair methods of competition and unfair and deceptive acts or practices described herein.

## COUNT V—VIOLATION OF MASS. GEN. LAWS. ch. 175H

217.    United incorporates by reference paragraphs 1 through 185 and 189 as if fully set forth herein and further alleges as follows.

218.    Massachusetts General Laws Chapter 175H proscribes individuals and businesses from "offer[ing] or pay[ing] any remuneration, including any bribe or rebate … directly or indirectly, overtly or covertly, in cash or in kind to induce any person to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service, or item for which payment is or may be made in whole or in part by a health care insurer[.]" Mass Gen. Laws ch. 175H § 3.

219.    Chapter 175H also states that "A person who receives a health care benefit or payment from a health care corporation or health care insurer which such person knows that he or she is not entitled to receive or be paid, or a person who knowingly presents or causes to be presented with fraudulent intent a claim which contains a false statement, shall be liable to the health care corporation or health care insurer for the full amount of the benefit or payments made, and for reasonable attorneys fees and costs, inclusive of costs of investigation." Mass Gen. Laws ch. 175H § 6. Chapter 175H further authorizes health care corporations and health care insurers to bring civil actions under the chapter. *Id.*

220.    ARA has offered and paid kickbacks and remuneration to nephrologists to induce them to recommend and arrange for dialysis patients to obtain dialysis services from ARA for which payment has been made by United.

221.    ARA has also offered remuneration and/or bribes to AKF in the form of massive "contributions" to induce AKF to arrange for ARA patients to use the money (by setting up a "grant" for the patients and then disbursing the money back to them) to enroll or stay enrolled in

United's plans and continue obtaining services from ARA on terms that serve ARA's financial interests. Payment for the services has been made by United.

222.    ARA has also offered and paid remuneration to dialysis patients by promising to waive and waiving their patient financial responsibilities and by routing disguised premium payments to patients through AKF to directly and indirectly induce those patients to enroll or stay enrolled in United's ASO and fully-funded plans and obtain dialysis services from ARA on terms that serve ARA's financial interest. Payment for these dialysis services has also been made by United.

223.    ARA's actions have rendered false the claims it has submitted to United for the dialysis services which ARA induced AKF to arrange and patients to obtain, and which ARA induced nephrologists to recommend and arrange.

224.    ARA has received a health care benefit or payment from a health care corporation or health care insurer which ARA knew it was not entitled to receive or be paid, and also knowingly presented, or caused to be presented with fraudulent intent, false claims.

225.    Accordingly, United is entitled to the full amount of the benefit or payments made to ARA on the claims afflicted by ARA's misconduct, as well as attorneys' fees and costs, inclusive of United's investigation costs.

## COUNT VI—UNJUST ENRICHMENT

226.    United incorporates by reference paragraphs 1 through 185 as if fully set forth herein and further alleges as follows.

227.    United has conferred benefits on ARA in the form of significant payments based on claims ARA submitted for dialysis services rendered to patients enrolled in United health plans, and ARA has knowledge of that benefit.

228.    ARA has received a direct benefit in the form of cash distributions from those payments. The payments also directly improve the commercial metrics upon which ARA's business is evaluated by the market and ARA's associated stock price.

229.     ARA has voluntarily accepted and retained the payments it has received and other associated benefits conveyed to them by United.

230.     Under the circumstances of this case, as set forth in the paragraphs above, it would be inequitable for ARA to retain the payments and benefits ARA has received.

231.     The money ARA has received from United belongs in equity and good conscience to United and certain sponsors of plans United administers.

232.     By virtue of the foregoing, United is entitled to recover the substantial amount of payments ARA has improperly retained.

## COUNT VII—RESTITUTION UNDER ERISA § 502(a)(3)

233.     United incorporates by reference paragraphs 1 through 185 as if fully set forth herein and further alleges as follows.

234.     Many of United's EGHP plans, including several of those targeted by ARA's misconduct, are governed by ERISA.

235.     With respect to the plans ARA has targeted, and virtually all other ERISA-governed plans United insures or administers, one of the United Plaintiffs in this matter has been delegated by the respective plan's Plan Administrator the fiduciary responsibility and discretion to review and make claims decisions for benefits under the terms of the plan. As a claims administrator and claims-review fiduciary, United acts as a fiduciary with standing to sue under ERISA § 502(a)(3) to obtain appropriate equitable relief to redress violations of United's ERISA plans' provisions and/or to enforce United's ERISA plans' provisions.

236.     For example, one of the exemplar United members identified above was covered under a Health Savings plan that identifies United Healthcare Services, Inc. and its affiliates as the Claims Administrator and plan fiduciary for the plan, requires participants to file claims for benefits with United Healthcare Services, Inc., and delegates to United Healthcare Services, Inc. the discretionary authority to determine all claims under the plan, interpret the terms of the plan and facts surrounding claims under the plan, and determine all questions arising in the

administration, interpretation, and application of the plan. Substantially similar discretion is delegated to United in the other United plans targeted by ARA's conduct.

237.    The ASAs United has with plan sponsors also typically identify United as an ERISA claims review fiduciary with respect to performing claim processing and payment and performing the fair and impartial review of appeals, and delegate to United discretionary authority to construe and interpret the terms of the plan, determine the validity of charges submitted to United under the plan, and make final determinations concerning the availability of plan benefits.

238.    As discussed above, the provisions of the United plans targeted by ARA require plan members to pay all of their cost-sharing obligations, do not cover any charges for services for which a non-network provider has waived any deductible, coinsurance, or copays, or for which members have no legal responsibility to pay, and allow United to recover amounts paid on charges that were not payable.

239.    As discussed above, in providing non-network services to plan members, ARA deliberately and routinely waived, failed to collect, and promised not to collect the full amount of those plan members' cost-sharing obligations, rendering the claims generated for its dialysis services not payable under the terms of the United plans.

240.    Nevertheless, ARA submitted claims and charges to United for those services anyway, and, relying on the representations in the claims, United made payments on claims that were not, in fact, payable or appropriate. ARA was not entitled to seek, collect, or retain the payments it received from United, and ARA has not returned those payments to United.

241.    The payments United made are specifically identifiable, and were deposited into bank accounts that were and continue to be under the control of ARA. Moreover, some or all of these payments remain in the bank accounts under the control of ARA. Thus, ARA is currently in possession of specifically identifiable payment funds that in good conscience belong to United and the ERISA plans it insures and administers that are at issue in this case. To the extent that some portion of the payments have been removed from these accounts, those sums were

59

transferred to, and remain in, other bank accounts within the possession, custody, and control of ARA, or they were exchanged for other property that is also in the possession, custody, or control of ARA.

242.    Pursuant to ERISA and the express terms of the United plans, United is entitled to recover the overpayments made to ARA.

243.    United seeks equitable restitution to recover the assets that ARA unlawfully obtained as a result of the conduct described above. United specifically seeks an order imposing a constructive trust on the assets that ARA received in the form of overpayments, as well as on any profits or income made by ARA through the use of those amounts held in constructive trust. United also seeks an order restoring to United on its own behalf and on behalf of plans governed by ERISA the sums held in constructive trust by ARA.

244.    United also seeks to enforce plan terms that require the return of overpayments through the imposition of an equitable lien by agreement over those payments. As discussed above, the plans targeted by ARA's conduct expressly authorize United to recover overpayments made on the plans' behalf. These recovery provisions create an equitable lien by agreement over any payments made by United, and put plan members and providers to whom plan members validly assign their claims on notice that any overpayment made by United will be recoverable (i.e., subject to the equitable lien) as soon as it is made, and rightfully belongs to United and/or the plans. United therefore seeks an order executing an equitable lien and requiring that the overpayments subject to this lien be returned to United.

### COUNT VIII—DECLARATORY AND INJUNCTIVE RELIEF UNDER ERISA § 502(a)(3) and 28 U.S.C. §§ 2201 and 2202

245.    United incorporates by reference paragraphs 1 through 185 as if fully set forth herein and further alleges as follows.

246.    United acts as a claims fiduciary for the plans targeted by ARA's conduct and has standing to sue under ERISA § 502(a)(3) for declaratory and injunctive relief to enjoin any acts

or practices that violate any provisions of the plans and to obtain other appropriate relief to redress such violations or enforce plan provisions.

247.    ARA has engaged in a scheme to defraud United into paying amounts to ARA in excess of amounts owed under the relevant plans, and on claims for services that are not covered under the relevant plans' terms, as discussed above.

248.    There is an actual case and controversy between United and ARA regarding whether the claims ARA has submitted and intends to continue to submit to United pursuant to the scheme described herein are payable.

249.    United contends that the scheme is deceptive, unfair, and unlawful, and that no payments are due to ARA on any claims that have been submitted or that are pending or may be submitted in the future pursuant to ARA's scheme. ARA disagrees.

250.    There is a bona fide, present, and practical need for a declaration as to the unlawfulness of ARA's actions and whether United has the right to not pay the claims implicated by ARA's actions and scheme, including any pending or future claims.

251.    United is entitled to a judgment declaring that ARA's actions and business practices are unlawful, and that any claims for payments of benefits submitted by ARA to United pursuant to the scheme described herein are not payable and void. United also seeks recovery of its reasonable and necessary attorneys' fees and costs, pursuant to ERISA § 502(g)(1).

252.    As to United plans targeted by ARA's conduct that are not governed by ERISA, pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, United is entitled to a judgment declaring that ARA's actions and business practices are unlawful, and that any claims for payments of benefits submitted to United pursuant to the scheme described herein are not payable and void.

253.    For all United plans targeted by ARA's conduct, United seeks an order: (a) enjoining ARM from submitting or causing to be submitted any claims to United for services for which ARA has not, will not, or has agreed to not collect the associated cost-sharing obligation from the United member who received the service, (b) enjoining ARM from

submitting or causing to be submitted any claims containing any charges that ARA does not actually require United members to pay (including, without limitation, the waiver of any portion of the members' required out-of-network deductible, coinsurance, and/or copay amounts), or that contain charges that are artificially inflated in any other way, (c) enjoining ARM from submitting or causing to be submitted claims that are tainted by the improper bribes, kickbacks, and inducements, as described herein, (d) requiring ARA to disclose to United if AKF money is being used to pay the premiums of any United members, (e) enjoining ARA from waiving or promising not to collect United members' cost-sharing obligations to induce United members to use ARA's out-of-network dialysis facilities, and (f) enjoining ARA from offering or paying remuneration to, or instructing, nephrologists in-network with United to refer United members out of network to ARA facilities for dialysis treatment.

## PRAYER FOR RELIEF

WHEREFORE, United respectfully requests an award in its favor and granting the following relief:

a.    An award of compensatory damages as requested herein;

b.    An award of punitive damages as requested herein;

c.    Equitable relief as requested herein;

d.    Declaratory and injunctive relief as requested herein;

e.    An award of attorneys' fees and costs as requested herein;

f.    Costs of court;

g.    Prejudgment and post-judgment interest; and

h.    An award of any other relief in law or equity that the Court deems just and proper.


Dated: March 30, 2018          By: _s/Jeffrey S. Gleason_____
                               Jeffrey S. Gleason (BBO #: 661489)
                               Robins Kaplan LLP
                               2800 LaSalle Plaza
                               800 LaSalle Avenue
                               Minneapolis, MN 55402–2015

T: (612) 349–8500
F: (612) 339–4181
jgleason@robinskaplan.com

*Counsel for Plaintiffs UnitedHealthcare Insurance
Company and United Healthcare Services, Inc.*